**UNITED STATES of America,
Appellee,**

**v.**

**Leon DUKAGJINI, Halit Shehu, Leonard George Miller, Jr., Keith John Miller, Warren Eugene Meeks, Jr., Leroy Thompson, III, Alvin Dwayne McDew, Michael Dexter, Sondra Jean Boone, Anthony Eugene McMillian, Raymond Fuller, Sonya Campbell, Rene Miller, James Robert Wilson and Roderick L. Smith, Defendants,**

**Samuel Curtis Griffin, also known as Black Bart, also known as Blackie, and Alvin Leon McGee, also known as Al, Defendants–Appellants.**

**Docket Nos. 00–1392(L), 00–1398(CON), 00–1476(XAP).**

United States Court of Appeals,
Second Circuit.

Argued Oct. 15, 2001.

Decided Dec. 27, 2002.

Amended March 11, 2003.

Jeffrey Wicks, (Craig D. Chartier, on the brief), Bansbach, Zoghlin, Wicks & Wahl, P.C., Rochester, NY, for Defendant–Appellant Samuel Curtis Griffin.

Edward S. Zas, Appeals Bureau, Federal Defender Division, The Legal Aid Society, New York, NY, for Defendant–Appellant Alvin Leon McGee.

Christopher P. Tuite, Assistant United States Attorney, (Kathleen M. Mehltretter, United States Attorney, Western District of New York, on the brief), Rochester, NY, for Appellee.

Before: WALKER, Chief Judge, MESKILL, Circuit Judge, and KOELTL, District Judge.*

JOHN M. WALKER, JR., Chief Judge.

Defendants-appellants Samuel Griffin and Alvin McGee were convicted in 1999 following a jury trial in the United States District Court for the Western District of

---

New York (David G. Larimer, *Chief District Judge* ). Griffin was convicted of conspiracy to distribute heroin and cocaine in violation of 21 U.S.C. § 846 and McGee was convicted of conspiracy to distribute heroin pursuant to the same statute. Both were also convicted of using a telephone to commit a controlled substance felony in violation of 21 U.S.C. § 843(b).

Both Griffin and McGee argue that the district court improperly admitted expert testimony interpreting the meaning of telephone conversations recorded through legal wiretaps. Griffin also argues that the district court improperly admitted testimony about his possession of a handgun, that he received ineffective assistance of counsel, and that his sentence violates *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

Although we conclude that some of the expert testimony should have been excluded, the error was harmless. Griffin's additional claims are without merit. We affirm.

## BACKGROUND

From approximately 1993 to 1996, Leonard Miller ran a large-scale operation selling heroin and, to a lesser extent, cocaine in Rochester, New York. Miller's heroin source was Leon Dukagjini (sometimes referred to as "Duke") in New York City.[1] Miller then cut and packaged the heroin for street-level sales in Rochester. Among those who assisted Miller were his brother Keith Miller, Raymond Fuller, and Linda Fuller, each of whom pleaded guilty to participating in the heroin distribution conspiracy and testified for the government against Griffin and McGee. They each testified that Griffin was an important lieu-tenant in Leonard Miller's organization and that he played a key role in cutting, distributing, and selling heroin. Keith Miller also testified that Griffin was one of the people within the organization who knew how to cook powder cocaine into crack. The cooperating witnesses explained to the jury that McGee participated in cutting and bagging the heroin and primarily distributed Miller's heroin to street-level dealers, and that most of the bagging sessions took place in a house on Raeburn Avenue.

In addition to the cooperator's testimony, the government presented evidence from a search of the Raeburn Avenue house. The search, conducted pursuant to a search warrant, turned up crack and powder cocaine, cash, ammunition, and drug-distribution paraphernalia. The government also introduced recordings of drug-related conversations from lawful wiretaps on the telephones of Leonard Miller and Keith Miller. Some of the conversations included Griffin or McGee talking with other coconspirators. Other members of the conspiracy were caught on tape discussing narcotics transactions involving "Al" or "Sam."

On March 12, 1999, the jury convicted Griffin on all counts and convicted McGee of two counts and acquitted him of one. The court sentenced Griffin and McGee principally to prison terms of 121 months and 87 months, respectively. This appeal followed.

## DISCUSSION

### A. Biggs's Testimony

The principal issue on appeal is whether the testimony of Special Agent Richard Biggs of the Drug Enforcement Agency

---

1. Dukagjini pled guilty in 1997 before trial. *United States v. Dukagjini,* 198 F.Supp.2d 299, 307 (W.D.N.Y.2002) (denying Dukagjini's mo-tion to withdraw his plea). He did not testify in the trial of the defendants in this case.

("DEA")—the case agent and also the government's expert on the use of code words in narcotics conversations—exceeded its proper bounds and therefore should have been excluded. Biggs became the case agent for the investigation in February 1997, after the wiretaps were concluded and the defendants had been arrested and arraigned. Biggs had monitored the wiretap interceptions in the case for about two months and prepared draft transcripts of those intercepts. As is common in drug conspiracy cases, most of the conversations on tape were disguised and ambiguous. The government called Biggs as an expert to testify about the meanings of the various code words used in the recorded conversations. The district court found that Biggs was qualified as an expert on the basis of his extensive experience in the area of narcotics trafficking as a police officer and a DEA agent, monitoring thousands of phone calls between suspected drug dealers.

The court cautioned the prosecutor to limit Biggs's testimony to "words of the trade, jargon," and general practices of drug dealers, rather than testimony offering "sweeping conclusions" and interpretations about the general meaning of conversations. Biggs testified at some length about the meanings of words used in the recorded conversations. He recited as the basis for his conclusions both his prior law enforcement experience and his "knowledge of the investigation" from the wiretapped conversations and his personal conversations with the other agents, witnesses, and co-conspirators. Biggs testified about intercepted co-conspirator statements characterizing the quality or condition of the heroin and the significance that those statements would have within the drug trade. For example, Biggs explained that when Miller asked Griffin "is it dry," he was asking whether the heroin was too wet to sell. Prior to Biggs's testimony, the trial court had assumed that "dry" would refer to being out of drugs. At other points, Biggs testified that "cooked" and "tasted a little funny" were descriptions of crack cocaine. Biggs also testified that when McGee said "he definitely goin' to come through today, get all his B licks today," "B-licks" referred to heroin.

In addition to interpreting drug jargon, Biggs's testimony included explanations of numerous statements in intercepted conversations between the appellants and Leonard Miller, none of whom testified. At one point during his testimony, Biggs admitted that some of his conclusions were "based upon [his] background and training including [his] knowledge and involvement in this case." Indeed, many parts of Biggs's testimony appear to have been based primarily upon his familiarity with the specifics of the case, rather than his general expertise in the drug trade. For example, Biggs explained that when Leonard Miller said "the other one and the what you call 'ems that they go in,'" Miller was "probably" referring to crack cocaine and its packaging materials, and in the same conversations, Miller's phrase "little packs" referred to "the small packages that drugs go into." Biggs also testified that Miller's statement to McGee, "just make sure you don't hit 'em in his head when he see you don't give him nothing," was an instruction "not to supply any heroin to Big Dog." Elsewhere, Miller berated Griffin because "five mother fuckers tryin' to get in touch with you," which Biggs interpreted to mean that "[h]e has five customers that need to be supplied with cocaine or heroin." Biggs also testified that when Miller told Griffin, "Al going to give you six dollars and you going to give him ten," "six dollars refers to payment for previously supplied heroin, and Mr. Miller wants Mr. Griffin to give Mr. McGee an-

other quantity of heroin, ten bundles." The defense objected to Biggs's testimony about the meaning of the taped conversations. The court overruled these objections, while also noting its concern that the testimony was straying from proper expertise about drug jargon.

McGee and Griffin challenge Biggs's testimony on several grounds. They argue first, that the testimony should have been excluded because the taped conversations were readily interpretable; second, that Biggs's testimony that certain conversations referred to specific drugs was impermissible; third, that Biggs's dual roles as case agent and as expert witness allowed him to serve as a summary witness, repeating and bolstering evidence previously received and thereby prejudicing the appellants; and fourth, that Biggs relied on inadmissible hearsay in violation of their Sixth Amendment confrontation rights. We will address each of these arguments in turn after briefly reviewing the general rules of evidence governing expert testimony.

## B. The Rules for Expert Testimony

A district court's discretion to admit expert testimony is controlled by Rules 702, 703, and 403 of the Federal Rules of Evidence. As it existed during the appellants' trial in 1999, Rule 702 provided that an expert witness may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." [2] Fed.R.Evid. 702 (1999). Rule 703 stated that an expert witness may base opinions on otherwise inadmissible facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." [3] Fed.R.Evid. 703 (1999). Of course, expert testimony, like other forms of evidence, "may be excluded if its probative value is substantially

---

**2.** This case was tried in 1999, before Rules 702 and 703 were amended in 2000. We apply the rules as they existed in 1999, because evidentiary rules are generally not retroactive. *See Loper v. Beto*, 405 U.S. 473, 493, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972) ("Neither fundamental fairness nor any specific constitutional provision requires that a rule of evidence be made retroactive; consideration for the orderly administration of justice dictates the contrary."). In any event, our decision would not be changed by the current version of the rules. The new Rule 702 incorporates the Supreme Court's guidelines for reliability of expert testimony set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). See *infra* for our discussion of Rule 702. The complete text of Rule 702 follows, with the 2000 additions in emphasis:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

Fed.R.Evid. 702 (2000) (emphasis added).

**3.** The new Rule 703 as amended in 2000 clarifies that the expert generally may not disclose otherwise inadmissible evidence. Again, we note that our decision would not be different under the new Rule 703. See *infra* for our discussion of Rule 703. The complete text of Rule 703 follows, with the 2000 additions in emphasis:

> If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible into evidence *in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.*

Fed.R.Evid. 703 (2000) (emphasis added).

outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. Because the district court has "broad discretion regarding the admission of expert testimony," we will sustain the district court's admission of the testimony unless it was "manifestly erroneous." *United States v. Locascio,* 6 F.3d 924, 936 (2d Cir.1993).

Pertinent to the instant case, we have consistently upheld the use of expert testimony to explain both the operations of drug dealers and the meaning of coded conversations about drugs. *See United States v. Garcia,* 291 F.3d 127, 139 (2d Cir.2002); *United States v. Ruggiero,* 928 F.2d 1289, 1304–05 (2d Cir.1991); *United States v. Simmons,* 923 F.2d 934, 946–47 (2d Cir.1991). In particular, we have recognized that drug dealers often camouflage their discussions and that expert testimony explaining the meanings of code words may "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702; *see, e.g., Simmons,* 923 F.2d at 946. In some cases, the government has produced expert witnesses with a specialty in understanding and interpreting the coded conversations used in narcotics trafficking. *See, e.g., United States v. Sureff,* 15 F.3d 225, 227, 228–29 n. 2 (2d Cir.1994) (affirming district court's admission of expert testimony where expert had extensive experience in cryptanalysis). And we have sustained convictions based on the expert testimony of agents who also testified as fact witnesses. *See United States v. Young,* 745 F.2d 733, 760–61 (2d Cir.1984).

## C. The Appellants' Arguments

### 1. The Appropriateness of Expert Testimony in this Case

■ Turning to appellants' first argument, we reject the contention that, because the conversations were readily understandable, the expert testimony should have been excluded altogether. The Rules of Evidence provide a liberal standard for the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Boissoneault,* 926 F.2d 230, 232 (2d Cir.1991). Frequently, some of the details of drug operations, as they emerge in intercepted conversations, are quite opaque. The conspirators in this case used jargon frequently and were deliberately ambiguous in their conversations about narcotics.

Moreover, the appellants' arguments at trial belied the idea that the language used was self-explanatory and easily understood. Griffin and McGee argued that various references that the government claimed to have been drug related were, in fact, about the sale of t-shirts and other apparel, and McGee presented several witnesses to support this theory. To be sure, appellants raise a more plausible argument that, although some of the expert testimony was admissible, a limited portion was a cumulative summary of evidence which needed no explanation. We will consider that argument below in the context of the use of the case agent as an expert witness.

### 2. Specifying the Illegal Drugs Involved

■ Griffin argues that an expert on the meaning of code words is barred by Rule 704(b) from stating conclusions about the precise controlled substances referred to in intercepted conversations. Rule 704(b) states,

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a de-

fense thereto. Such ultimate issues are matters for the trier of fact alone.

Fed.R.Evid. 704(b). Griffin is correct that this court has expressed discomfort about uncontrolled expert testimony that provides sweeping conclusions. *See United States v. Nersesian,* 824 F.2d 1294, 1308 (2d Cir.1987); *United States v. Brown,* 776 F.2d 397, 401 (2d Cir.1985). However, we have permitted experts to testify specifically about which drugs were involved in a case. *Simmons,* 923 F.2d at 946–47 n. 5 (distinguishing *Nersesian,* 824 F.2d at 1307–09). Rule 704(b) applies to questions of mental state, and does not restrict conclusions about facts, such as opinion evidence identifying subjects of a conversation. In *Simmons,* we concluded that the witness's interpretation of drug terminology, including specification of certain drugs, did not violate Rule 704(b) because it "left to the jury the task of determining whether the decoded terms demonstrated the necessary criminal intent." *Id.* at 947. Accordingly, we conclude that the district court did not err by allowing Biggs to testify that code words referred to specific drugs.

### 3. Case Agent as Expert

Appellants argue that Biggs's dual roles as case agent and expert witness allowed him to serve as a summary witness, improperly testifying as an expert about the general meaning of conversations and the facts of the case. We agree that the use of the case agent as an expert increases the likelihood that inadmissible and prejudicial testimony will be proffered. While expert testimony aimed at revealing the significance of coded communications can aid a jury in evaluating the evidence, particular difficulties, warranting vigilance by the trial court, arise when an expert, who is also the case agent, goes beyond interpreting code words and summarizes his beliefs about the defendant's conduct based upon his knowledge of the case.

First, as we have observed elsewhere, when a fact witness or a case agent also functions as an expert for the government, the government confers upon him "[t]he aura of special reliability and trustworthiness surrounding expert testimony, which ought to caution its use." *Young,* 745 F.2d at 766 (Newman, J., concurring), *cited with approval by Simmons,* 923 F.2d at 947. This aura creates a risk of prejudice "because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial," a risk that increases when the witness has supervised the case. *Id.* Simply by qualifying as an "expert," the witness attains unmerited credibility when testifying about factual matters from first-hand knowledge. Additionally, when the expert bases his opinion on in-court testimony of fact witnesses, such testimony may improperly bolster that testimony and may "suggest[ ] to the jury that a law enforcement specialist ... believes the government's witness[ ] to be credible and the defendant to be guilty, suggestions we have previously condemned." *United States v. Cruz,* 981 F.2d 659, 663 (2d Cir. 1992) (citing *United States v. Scop,* 846 F.2d 135, 139–43 (2d Cir.1988)).

Second, expert testimony by a fact witness or case agent can inhibit cross-examination, thereby impairing the trial's truth-seeking function. In general, impeaching an expert is difficult. The expert usually has impressive credentials, and he is providing an opinion that, unlike a factual matter, is not easily contradicted. Challenges to the expert are often risky because they can backfire and end up bolstering the credibility of the witness. Normally, this is an acceptable risk for the defense, because only the witness's exper-

tise is at stake. However, when the expert is also a fact witness, the risks are greater. A failed effort to impeach the witness as expert may effectively enhance his credibility as a fact witness. Because of this problem, a defendant may have to make the strategic choice of declining to cross-examine the witness at all.

Third, and of particular relevance to this case, when the prosecution uses a case agent as an expert, there is an increased danger that the expert testimony will stray from applying reliable methodology and convey to the jury the witness's "sweeping conclusions" about appellants' activities, deviating from the strictures of Rules 403 and 702. *Simmons,* 923 F.2d at 946–47 n. 5. Although we approve of testimony interpreting drug code words, such expert testimony, unless closely monitored by the district court, may unfairly "provid[e] the government with an additional summation by having the expert interpret the evidence," and "may come dangerously close to usurping the jury's function." *Nersesian,* 824 F.2d at 1308; *see also United States v. Rivera,* 22 F.3d 430, 434 (2d Cir.1994); *Simmons,* 923 F.2d at 947. As the testimony of the case agent moves from interpreting individual code words to providing an overall conclusion of criminal conduct, the process tends to more closely resemble the grand jury practice, improper at trial, of a single agent simply summarizing an investigation by others that is not part of the record. Such summarizing also implicates Rule 403 as a "needless presentation of cumulative evidence" and a "waste of time." Fed.R.Evid. 403.

■ Under *Daubert* and Rule 702, expert testimony should be excluded if the witness is not actually applying expert methodology. Incorporating the *Daubert* standard, the amended Rules of Evidence require that expert testimony be based on "sufficient facts or data" and on "reliable principles and methods" that the expert "witness has applied reliably to the facts of the case." [4] Fed.R.Evid. 702. The Advisory Committee Notes to revised Rule 702 now state that,

> when a law enforcement agent testifies regarding the use of code words in a drug transaction, .... [t]he method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Fed.R.Evid. 702 advisory committee's notes. When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded. Even if the testimony is admissible under Rule 702, it still must pass muster under Rule 403: Its probative value must not be substantially outweighed by unfair prejudice. *See Young,* 745 F.2d at 765–66 (Newman, J., concurring).

Straying from the scope of expertise may also implicate another concern under Rule 403, juror confusion. Some jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case. When the witness is a case agent who testifies about the facts of the case and states that he is basing his expert conclusions on his knowledge of the case, a juror understandably will find it difficult to navigate the tangled thicket of expert and factual testimony from the single witness, thus impairing the juror's ability to evaluate credibility.

---

**4.** See *supra* note 2 for the full text of Rule 702, noting the additions to the Rule in 2000.

Throughout much of Biggs's testimony, his conclusions appear to have been drawn largely from his knowledge of the case file and upon his conversations with co-conspirators, rather than upon his extensive general experience with the drug industry. The district court properly established initial limits on Biggs's testimony that complied with relevant circuit precedent. However, when Biggs strayed beyond those limits, and when defense counsel objected, the district court did not enforce them and thus failed to fulfill its gatekeeping function. We find that the district court erred in allowing Biggs to stray from his proper expert function. Biggs acted at times as a summary prosecution witness; the effect was a bolstering of the testimony of the cooperating co-defendants and an impinging upon the exclusive function of the jury.

Biggs's testimony illustrates two examples of how an expert on drug code can stray from the scope of his expertise. First, he testified about the meaning of conversations in general, beyond the interpretation of code words. This testimony often interpreted pronouns and completely ambiguous statements that were patently not drug code. For example, when Biggs testified that the statement "what's left over there in that can" referred to "probably ... bundles of heroin," he essentially used his knowledge of the case file and witness interviews that the participants in the conversation were heroin dealers to conclude that they were discussing heroin. Although the same conversation included references to "sandwich bags" and "lighters," and an expert could admissibly explain to a jury the use of lighters and sandwich bags in the drug trade, the permissible scope of Biggs's expert testimony on the tapes was the interpretation of drug code, and "what's left over there in that can" is plainly not code. Biggs also testified that when Leonard Miller told McGee not to give "him ... no more than one or two," Miller was telling McGee not to give "Big Dog any more than one or two bundles of heroin," and that when McGee said to Leonard Miller "make sure you get your thing, your new one," he was referring to "the next supply of heroin." Again, these statements plainly were not drug code.

Second, Biggs interpreted ambiguous slang terms that only at first glance might appear to be code or jargon. For example, Biggs testified that McGee's statement "tell 'em to bring ... the six or whatever' " referred to "a quantity of heroin," and McGee's statement "tell him to come with the ten" meant that he requested "a quantity of heroin, probably ten bundles." "Six" and "ten" may have been veiled references to drugs, but it appears that these phrases were ambiguous in the way that the generic "your thing," "what's over there," and "one or two" were ambiguous. There was no evidence that these phrases were drug code with fixed meaning either within the narcotics world or within this particular conspiracy, in the way that "B-licks" and "spider" were consistent drug jargon or code. As we discuss below, there is a high risk that when a case agent/expert strays from the scope of his expertise, he may impermissibly rely upon and convey hearsay evidence. *See infra* Subsection 4.

We recognize that the problems we have highlighted do not arise solely in expert testimony by case agents and fact witnesses; any expert in a criminal trial has the potential to deviate from the scope of his expertise. However, these difficulties are more likely to be encountered when the expert is a case agent or a fact witness because such witnesses are introduced to the case primarily through an investigative lens, rather than a general methodological lens. Case agent experts who are called to

testify about both their expert opinions and the facts of the case may easily elide these two aspects of their testimony. Given their role, their perspective, and their focus on the facts, these case agent experts are more likely to stray from the scope of their expertise and to testify about other aspects of the case, including the divulging of hearsay evidence.

■ We have been aware of the heightened risk of allowing case agents to testify as experts, but nevertheless have permitted such testimony. *See, e.g., United States v. Feliciano,* 223 F.3d 102, 121 (2d Cir.2000) ("Such dual testimony is not objectionable in principle"); *Young,* 745 F.2d at 760 ("[I]t was not improper for the government to elicit ... expert testimony from law enforcement officers who also testified as fact witnesses."). Although we decline to prohibit categorically the use of case agents as experts, we note that the Federal Rules of Evidence and the Supreme Court place the responsibility upon the district courts to avoid falling into error by being vigilant gatekeepers of such expert testimony to ensure that it is reliable, *see Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (interpreting *Daubert,* 509 U.S. at 589–92, 113 S.Ct. 2786), and not substantially more unfairly prejudicial than probative.

We also note that proper application of the rules of discovery will encourage the prosecution to limit the scope of the expert testimony by a case agent or a fact witness. Rule 16 provides markedly broader discovery with respect to expert witnesses for the government than is required for other types of information from the government. Rule 16 provides that the defense is entitled to discovery of a written summary of expert testimony that the government intends to use in its case-in-chief. Fed.R.Crim.P. 16(a)(1)(G).[5] That summary "must describe the witness's opinions, the bases and the reasons for those opinions, and the witness's qualifications." *Id.* This disclosure requirement creates an incentive for the government to limit its use of experts to proper subject matters of expert testimony, lest broader expert testimony require broader pre-trial disclosure.

### 4. Hearsay and the Confrontation Clause

Appellants contend that Biggs's testimony improperly relied on hearsay evidence, including statements from non-testifying co-conspirators, and disclosed hearsay evidence to the jury. *See* Fed.R.Evid. 801(c) (hearsay defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). This argument implicates Rule 703, which governs the basis of opinion testimony by experts, and the Confrontation Clause of the Sixth Amendment, which guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.[6] "[T]estimony need not contain an ex-

---

**5.** At the time of the trial, this rule was located at Fed.R.Crim.P. 16(a)(1)(E) with slightly different wording. Rule 16 was modified on November 2, 2002. None of the changes affects our analysis.

**6.** In this case, the appellants' hearsay and Confrontation Clause claims are coextensive, but we recognize that, although the hearsay rules and the Confrontation Clause "are generally designed to protect similar values," the Supreme Court has "been careful not to equate" them. *Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *see also California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (noting that some hearsay testimony does not violate the Confrontation Clause, and some

plicit accusation in order to be excluded as a violation of the Confrontation Clause," and implied assertions may qualify as hearsay. *Ryan v. Miller*, 303 F.3d 231, 248 (2d Cir.2002) (citing *Mason v. Scully*, 16 F.3d 38, 42–43 (2d Cir.1994); *United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994); *United States v. Reynolds*, 715 F.2d 99, 103 (3d Cir.1983)).[7]

The government cites *Locascio* for the proposition that experts may rely on information provided by others without violating Sixth Amendment confrontation rights or the hearsay rule. In *Locascio*, the defendant argued that the government's expert witness had "relied upon countless nameless informers and countless tapes not in evidence." 6 F.3d at 937–38 (internal quotation marks omitted). The expert in that case qualified as an expert on the structure and operation of organized crime families, and, within the scope of that expertise, explained the hierarchy of the particular families and in identifying the voices in taped conversations. *See id.* at 936–37. We ruled that "expert witnesses

can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions," and we applied the principles of Rule 703 in holding that the expert's testimony was proper because law enforcement agents routinely and reasonably rely upon hearsay in reaching their conclusions. *Id.* at 938; *see also United States v. Daly*, 842 F.2d 1380, 1387–88 (2d Cir.1988) ("[I]f experts in the field reasonably rely on hearsay in forming their opinions and drawing their inferences, the expert witness may properly testify to his opinions and inferences based upon such hearsay."). In *Locascio*, we stressed that "the fact that [the expert witness] relied upon inadmissible evidence is … less an issue of admissibility [of the expert testimony] for the court than an issue of credibility for the jury." *Locascio*, 6 F.3d at 938. The jury must assess the credibility of the opinion of the expert, who is presumed to "have the skill to properly evaluate the hearsay," *id.*, and is, of course, available to be cross-examined.[8]

violations of the Confrontation Clause are not hearsay testimony).

**7.** We note that *Ryan* includes language that one might interpret to require that the testimony must clearly convey both the source and the content of the out-of-court declaration in order for it to violate the Confrontation Clause and the hearsay prohibition. *Ryan*, 303 F.3d at 250 ("The relevant question is whether the way the prosecutor solicited the testimony made the source and content of the conversation clear.") However, in that case, the prosecutor attempted to circumvent the hearsay rule and the Confrontation Clause by having police officers testify that they charged the defendant with murder "as a result of talking with" the officer who had just obtained a confession from a co-defendant. *Ryan*, 303 F.3d at 241. The witnesses were able to convey the content of the hearsay accusation (Ryan's culpability) only by plainly implying its source (the confessing co-defendant) in the context of Ryan's immediately being charged thereafter. However, when

the content of the testimony is already plain, there is a violation if the record simply reflects that the source was an out-of-court declarant. Indeed, the hearsay problem is exacerbated when the out-of-court source of the evidence is not revealed, because the jury is not even able to factor into its deliberations the reliability (or unreliability) of the particular source. Moreover, when it is unclear to the jury that the source of an accusation is an out-of-court declarant (rather than expertise, for example), the jury is even less aware of any potential unreliability of such hearsay testimony.

**8.** Rule 703 as amended in 2000 clarifies that the expert generally may not disclose otherwise inadmissible evidence. *See supra* note 3 for the text of Rule 703 as amended in 2000. The amended Rule 703 is consistent with *Locascio*'s conclusion that experts are not barred *per se* from relying upon inadmissible evidence or from disclosing such evidence to the jury. The district court has the authority

Thus, in *Locascio*, we recognized that, under certain circumstances, an expert witness may rely on hearsay, but we did not wholly exempt expert testimony from the hearsay rule. Prior to the amendment of Rule 703, other circuits had concluded that "an expert is permitted to disclose hearsay for the limited purpose of explaining the basis for his expert opinion, Fed. R.Evid. 703, but not as general proof of the truth of the underlying matter, Fed. R.Evid. 802." *Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1356 (5th Cir. 1983); *see also United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1496 (9th Cir.1997) (error to admit hearsay offered as the basis of expert opinion without a limiting instruction); *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728–29 (6th Cir. 1994) ("Rules 702 and 703 do not ... permit the admission of materials, relied on by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible."); *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261–62 (9th Cir.1984) ("Rule 703 merely permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion."). However, the government has cited no case, and we have found none, in which a court has permitted a witness to rely on hearsay for non-expert testimony simply because that witness was also qualified to rely on hearsay for other, expert, testimony.

In 1993, the Supreme Court recognized that the Rules of Evidence assign "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786. Incorporating the *Daubert* standard, the amended Rules of Evidence require that expert testimony be based on "sufficient facts or data" and on "reliable principles and methods" that the expert "witness has applied reliably to the facts of the case." [9] Fed.R.Evid. 702. The Advisory Committee Notes to revised Rule 702 now state that,

> when a law enforcement agent testifies regarding the use of code words in a drug transaction, .... [t]he method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Fed.R.Evid. 702 advisory committee's notes.

■ When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded. Moreover, even if the testimony is admissible under Rule 702, it still must pass muster under Rule 403: Its probative value must not be substantially outweighed by unfair prejudice. *See Young*, 745 F.2d at 765–66 (Newman, J., concurring). Consistent with *Locascio*, we hold that an expert witness may rely on hearsay evidence while reliably applying expertise to that hearsay evidence, but may not rely on hearsay for any other aspect of his testimony. Such improper reliance violates Rule 703, the hearsay rule, and the Confrontation Clause.

■ Unlike the expert in *Locascio*, Biggs's testimony at times departed from the bounds of Rules 702 and 703 and from

to make judgments about probative value and prejudice, and the reliability of the expert testimony. *See Locascio*, 6 F.3d at 938–39.

**9.** See *supra* note 2 for the full text of Rule 702, noting the additions to the Rule in 2000.

reliable methodology, as he repeatedly deviated from his expertise on drug jargon. Although in some cases it may be difficult to discern the line between permissible and impermissible reliance on hearsay, here Biggs's testimony repeatedly crossed that line. For approximately seventy pages of transcript testimony, Biggs interpreted Leonard Miller's recorded telephone conversations. Immediately after finishing his interpretations of the recorded conversations, Biggs was asked by the prosecutor for the basis of his opinions, and he answered: "These opinions [interpreting the recorded conversations] are based on my knowledge of the investigation ... [and] also from speaking with *cooperating individuals* and *from speaking with cooperating defendants.*" (emphasis added). On redirect, the prosecution again asked, "What are you relying on in support of your interpretation of those calls?" Biggs answered, "Again, it's my entire knowledge of this investigation which includes ... speaking with *cooperating individuals and cooperating defendants.*" (emphasis added). In interpreting terms such as " "what's left over there in that can," " "one or two," "your thing, your new one," and "six or whatever," Biggs plainly was not translating drug jargon, applying expert methodology, or relying on his general experience in law enforcement. Rather, he was relying on his conversations with non-testifying witnesses and co-defendants in order to prove "the truth of the matter asserted" about the meaning of the drug conversations. Fed.R.Evid. 801(c). *Locascio* permits an expert to rely on hearsay evidence for the purposes of rendering an opinion based on his expertise, but in this case the expert was repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the government to circumvent the rules prohibiting hearsay. The government argues that the appellants had an opportunity to cross-examine Biggs, but that, of course, is no answer when it is the out-of-court declaration of another, not subject to cross-examination, that is being put before the jury for the truth of the matter asserted. Whenever a court permits a case agent or a fact witness to testify as an expert, there is a significant risk that, if the witness digresses from his expertise, he will be improperly relying upon hearsay evidence and may convey hearsay to the jury.

Nevertheless, it is plain to us that portions of Biggs's statements that he conceded to have been at least partially the product of his out-of-court interviews with co-conspirators were neither within the permissible bounds of expertise authorized by *Locascio* nor within recognized exceptions to the hearsay rule. That testimony from an out-of-court source or sources was both accusatory and offered for the truth of the matter asserted, and the government made no "showing of particularized guarantees of trustworthiness." *Wright,* 497 U.S. at 815, 110 S.Ct. 3139 (setting forth the rule for the Confrontation Clause). Thus, the district court erred in permitting these aspects of Biggs's testimony in violation of the hearsay rule and the Confrontation Clause.

### D. Review for Plain Error and Harmless Error

Having concluded that the district court erred in admitting parts of Biggs's testimony, we must determine what standards of review apply. We conclude that the appellants failed to preserve their objection to the Confrontation Clause violation, and consequently, we evaluate the district court's admission of testimony in violation of the Confrontation Clause for plain error. *See United States v. Aulicino,* 44 F.3d 1102, 1110 (2d Cir.1995). We evaluate the erroneous admission of hearsay

evidence for harmless error. *See Rivera,* 22 F.3d at 436 (2d Cir.1994).

■ Defense counsel never mentioned the Confrontation Clause or any Confrontation Clause case law in any of their objections, nor did they offer any similar statement that Biggs's testimony denied the appellants their right to confront their accuser. Even assuming, *arguendo,* that defense counsel actually offered a proper hearsay objection to Biggs's testimony, such a hearsay objection would not in itself preserve a Confrontation Clause claim. As we have noted in dicta:

> [A] defendant's claim that he was deprived of a fair trial because of the admission in evidence of a statement objectionable as hearsay would not put the court on notice that the defendant claimed a violation of his constitutional right to be confronted by his accusers.

*Daye v. Attorney Gen. of New York,* 696 F.2d 186, 193 (2d Cir.1982) (en banc).[10] Other circuits have reached similar conclusions. *See United States v. LaHue,* 261 F.3d 993, 1009 (10th Cir.2001), cert. denied, 534 U.S. 1083, 122 S.Ct. 819, 151 L.Ed.2d 701 (2002) (trial counsel had raised hearsay objection, but "[w]here a Confrontation Clause objection is not explicitly made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise [it] *sua*

*sponte* ") (quoting *United States v. Perez,* 989 F.2d 1574, 1582 (10th Cir.1993) (en banc)); *cf. Greer v. Mitchell,* 264 F.3d 663, 689 (6th Cir.2001) (rejecting defendant's argument that "trial court's ruling on hearsay objections were significant enough to implicate the Confrontation Clause").

■ We adhere to the principle that, as a general matter, a hearsay objection by itself does not automatically preserve a Confrontation Clause claim. To be sure, an objection to hearsay testimony could be stated in such a way to put a trial court on notice that Confrontation Clause concerns are implicated as well. However, the appellants in this case did not do this. Even after the government noted in its appellate brief that it "does not concede" that the appellants properly raised either the hearsay or the Confrontation Clause objections below, the appellants failed to point out a single reference to the Confrontation Clause, either in name or in substance, or to a single instance in which trial counsel used the term "hearsay" or cited any relevant Rule of Evidence or precedent in objecting to the inadmissible portions of Biggs's testimony. We also have not found any such references in the trial record. Although a hearsay objection arguably could be discerned from the objections during Biggs's testimony (which focused mainly on whether Biggs could

---

10. In *Daye,* we ruled *en banc* that a habeas petitioner had exhausted his state remedies with regard to his claim that he was denied a fair trial because of judicial bias. Judge Kearse's opinion presented the hearsay scenario above as an example of a situation in which a state prisoner seeking federal habeas relief would have failed to exhaust his state remedies for a confrontation clause violation. Even though *Daye* concerned exhaustion of state remedies under 28 U.S.C. § 2254, its reasoning on hearsay and the right to confrontation applies with equal force to issue of preservation for direct appeal, as well. While

*Daye* includes other language suggesting that a defendant could exhaust his state remedies "even without citing chapter and verse of the Constitution," with, for example, an "allegation of a pattern of facts that is well within the mainstream of constitutional litigation," *Daye,* 696 F.2d at 194, our specific reference to hearsay and the Confrontation Clause quoted above in *Daye* offers clearer guidance in this case. We also note that the appellants in the instant case never alerted the court to any constitutional question during Biggs's testimony and only pointed to non-constitutional areas of law.

testify about drug code or on whether Biggs was "speculating"), these cryptic comments do not remotely yield a Confrontation Clause objection. Defense counsel's failure to put the court on notice that Biggs's testimony infringed the appellants' constitutional rights never gave the government a fair opportunity to reply, to properly limit its questions to Biggs, or, once apprised of these heightened constitutional concerns, to decide to call Leonard Miller, a participant in the conversations, to interpret his taped statements. Because the appellants did not preserve their Confrontation Clause claim for appeal, "the admission of evidence in violation of [their] Confrontation Clause rights is ground for reversal only if it constitute[d] plain error." *Aulicino*, 44 F.3d at 1110 (citing Fed.R.Crim.P. 52(b)).

 The Supreme Court has established the following standard for plain error review:

> Before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (internal quotation marks and citations removed). First, an error is plain if it is "clear" or "obvious" at the time of appellate consideration. *Id.* at 467–68, 117 S.Ct. 1544. While the appellants' trial counsel objected to Biggs's testimony in general, they did not hint at a Confrontation Clause issue. A major thrust of the objections by defense counsel was that Biggs was speculating, an argument that would have been inconsistent with the argument that Biggs was actually conveying the out-of-court statements of Leonard Miller in violation of the Confrontation Clause. In these circumstances, we do not conclude that the Confrontation Clause violations were obvious. Moreover, while Biggs's testimony obviously veered from the expertise of interpreting drug code, the conclusion that he was relying on hearsay requires an inference that was not so obvious as to be correctable as plain error.

 Second, we have explained that an error affects a defendant's "substantial rights" if it is "prejudicial" and it "affected the outcome of the district court proceedings." *United States v. Gore*, 154 F.3d 34, 47 (2d Cir.1998) (citing *Olano*, 507 U.S. 725, 734–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Moreover, reversal for plain error is "to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (citations omitted). As we discuss below, the error here did not affect the outcome of the proceedings. Thus, the error did not affect substantial rights. Nor did it affect the fairness and integrity of the proceedings or yield a miscarriage of justice. Accordingly, we find that the district court's admission of testimony in violation of the Confrontation Clause did not amount to plain error.

 Assuming *arguendo* that a proper hearsay objection was made, we now consider whether the non-constitutional evidentiary errors were harmless. *See* Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."). In order to uphold a verdict in the face of an evidentiary error, it must be "highly probable" that the error did not affect the verdict. *United States v. Forrester*, 60 F.3d 52, 64 (2d Cir.1995). Re-

versal is necessary only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *United States v. Castro,* 813 F.2d 571, 577 (2d Cir.1987) (internal quotation marks omitted). The principal factors for such an inquiry are "the importance of the witness's wrongly admitted testimony" and "the overall strength of the prosecution's case." *Wray v. Johnson,* 202 F.3d 515, 526 (2d Cir.2000). As the Supreme Court has explained, "[i]f, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . ." *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

██ In this case, the error in admitting the improper aspects of Biggs's testimony did not have a "substantial influence" on the jury's verdict. *Id.* at 765, 66 S.Ct. 1239. First, as noted above, three cooperating witnesses—Keith Miller, Raymond Fuller, and Linda Fuller—testified extensively that both McGee and Griffin were significant participants in the heroin production and distribution conspiracy. Second, the taped conversations, interpreted in light of Biggs's admissible expert testimony regarding drug code, were particularly incriminating for both McGee and Griffin. For example, the tapes contain McGee's references to "B-licks" and "spider," which Biggs explained were coded references to heroin. Even if Biggs's testimony interpreting the taped conversations had been excluded entirely, the jurors could have interpreted the recorded conversations as involving narcotics based on the testimony of other witnesses. Co-conspirator Keith Miller, for example, explained the meaning of the taped narcotics conversations in which he participated (raising no hearsay concerns), and these conversations implicated both appellants.

Independent of Biggs's testimony, Miller explained the drug code terminology, such as "spider," that he, McGee, and Griffin each used in their recorded conversations. Once Keith Miller provided this admissible explanation of such jargon, it was apparent that McGee and Griffin were discussing the details of heroin production and distribution. Third, a search of Griffin's residence turned up both drugs and drug paraphernalia, and he was arrested with a handgun which, according to taped discussions by the Miller brothers, he purchased for protection against robbery of either drugs or drug money.

The inadmissible aspects of Biggs's testimony, viewed in relation to the prosecution's formidable array of admissible evidence, was merely corroborative and cumulative. *See Wray,* 202 F.3d at 526 ("[W]here the wrongly admitted evidence was cumulative of other properly admitted evidence, it is less likely to have injuriously influenced the jury's verdict."). The appellants claim that the prosecution emphasized the wrongly admitted evidence in its closing argument. *See id.* We disagree. The government's summation focused mostly on the co-conspirator testimony, the tapes themselves, and Miller's and Biggs's admissible interpretation of drug code, such as the terms "B-licks" and "spider." Considering that the co-conspirators' testimony already had properly established that background and context, Biggs's inadmissible hearsay testimony played only a minor role in the government's arguments. Examining "the proceedings in their entirety," we conclude that the error did not affect the jury's verdict. *Kotteakos,* 328 U.S. at 762; *see also United States v. Check,* 582 F.2d 668, 684 (2d Cir.1978).

### E. The Appellants' Other Claims

██ We easily dispose of Griffin's additional claims of error. Miller's testi-

mony that Griffin had told him about his possession of a gun was properly admissible as the party's own statement, pursuant to Rule 801(d)(2)(A). The tape-recorded conversations about the handgun were properly admitted as statements by co-conspirators made in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). Griffin's claim under *Apprendi* is meritless because he was sentenced to 121 months imprisonment, within the twenty-year statutory maximum. *See United States v. McLeod,* 251 F.3d 78, 82 (2d Cir.), *cert. denied,* 534 U.S. 935, 122 S.Ct. 304, 151 L.Ed.2d 226 (2001). Finally, we conclude that Griffin's claims of ineffective assistance of counsel are without merit. *See Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

## CONCLUSION

The judgments of conviction and sentences are AFFIRMED.