This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 91
The People &c.,
          Respondent,
        v.
Jose Inoa,
          Appellant.



          John R. Lewis, for appellant.
          Christopher P. Marinelli, for respondent.



LIPPMAN, Chief Judge:

    Early on the morning of January 11, 2005, Edward Contreras

and an associate, Christian Santos, were shot in a grocery store

at the corner of Sherman Avenue and West 204th Street in Upper

Manhattan.  Contreras died of his wounds several hours later.

- 1 -

Santos, although seriously injured, survived.  In March 2009, defendant, Oman Gutierrez and several others were indicted in connection with those shootings.  As is here relevant, defendant and Oman Gutierrez were charged with first degree murder (Penal Law § 125.27 [1] [a] [vi]).  It was alleged that defendant murdered Contreras at Gutierrez's request and that he had expected to be paid for doing so.

Defendant and Oman Gutierrez were tried together in June and July of 2010.  The jury heard evidence that, in the late 1990s, Oman Gutierrez led a drug ring that did business on a block situated at Post Avenue and West 204th Street in Washington Heights.  Following a law enforcement "take down" of the Gutierrez ring in 1999, Oman and several of his associates were prosecuted and imprisoned for lengthy terms, and in their absence Edward Contreras and his drug dealing crew took over the Post and 204th Street location.  Trial testimony by Eldia Duran, Oman Gutierrez's paramour during the period of the Contreras shooting, together with transcribed recordings of some 77 telephone calls made to Duran and third parties by Oman from prison[1] between December 2004 and May 2005, was introduced to prove that, as

---

[1]The third parties -- usually, individuals Oman had not received the requisite permission from prison authorities to telephone --  were conferenced-in by Duran (who Oman was permitted to call) at Oman's direction.  Duran testified that she routinely remained on the line and overheard what was said, even if she was not included in the conversation, so as to be available to act as Oman's de facto telephone operator.

Oman's term neared its anticipated conclusion, he schemed to eliminate Contreras, whose appropriation of his "spot" on West 204th Street he believed prevented his ring from making money. Duran testified that in conversations, both recorded and unrecorded, to which she was either a party or privy, Oman disclosed his intention to have defendant, a trusted childhood friend from the neighborhood of 204th and Post, known by a variety of street names -- mostly canine, but also as "Andy" and "Zim" -- return to New York City from Georgia, where he then lived, to perform the assassination. Duran said it was understood that, although the still imprisoned Oman had no money, defendant eventually would be paid for removing Contreras. She explained that, on his release from prison, Oman expected to receive $20,000 from one Orlando Torres and that he intended to use half of that sum to compensate defendant.

Duran recounted that upon defendant's arrival in New York City in early January 2005, Oman insisted on keeping him secluded and was concerned that his own contemporaneous return to the streets for several days a week as a participant in a transitional work release program should not become public knowledge. Duran stated that, in preparation for the assassination, defendant and members of Oman's crew, chauffered by Joaris Grullon, the wife of one of Oman's associates, surveilled Contreras to ascertain when and where "to get the perfect shot"; that Oman was impatient at the inept way in which

his design on Contreras' life was being executed and was particularly displeased that the shooting did not take place as planned on January 9th; and that, on the evening of January 9th, Oman spoke by telephone from the Edgecombe Correctional Facility with defendant[2] and received defendant's assurance that "She gonna get done kid. Don't worry about it, big boy. I got this."

Joaris Grullon testified that on the following night -- the night of January 10th to January 11th -- she drove her blue Honda to pick up defendant and Oman's cousin Randy Gutierrez on West 218th Street, as she had the night before. She said she drove the men around for about an hour, as she had the previous evening, and then, at Randy's direction, double-parked near the corner of Vermilyea Avenue and West 204th Street. Defendant, she recalled, got out of the car and walked in the direction of West 204th Street. About ten minutes later he returned, "rushed" into the car and directed her in Spanish to take off. According to Grullon, she then returned to 218th Street and dropped defendant and Randy Gutierrez off.

Enrique Zorilla, Edward Contreras's cousin and driver, testified that while walking to one of Contreras's cars late on the night of January 10th and 11th he noticed defendant, first leaning against a wall smoking, and then jogging toward a bodega

---

[2]Oman, although then on work-release, was required to spend Sundays at the Edgecombe facility. It emerged at trial that the killing had been originally set for January 9, 2005, a Sunday, to provide Oman an alibi of sorts.

located on West 204th Street and Sherman Avenue, entered moments before by Contreras and Christian Santos. Defendant, he said, pulled a gun from his back pocket as he neared and went into the market. Zorilla remembered hearing shots within the market, and then seeing defendant exit the store, fire another round into the market and take flight. Kenny Ortiz testified that on the early morning of January 11, 2005 he was walking on West 204th Street near Vermilyea Avenue when he heard a gunshot. He remembered taking cover between parked cars and seeing defendant, whom he knew from a prior encounter,[3] run by, gun in hand, and get into a car at Vermilyea Avenue. Contreras was transported to the hospital by Zorilla and Contreras's friend, Jose Antonetti. Antonetti testified that, on the way, he asked Contreras who had shot him and that Contreras replied, "Andy."

Ms. Duran testified that, after the shooting, Oman wanted defendant to keep off the streets and then to stay in Georgia (to which he had temporarily returned) until things cooled off, but that defendant, who had announced his intention immediately to "throw himself on the block" and was anxious to be paid, was not cooperative. Duran reported to Oman that defendant had threatened to come to New York to get his money directly from Orlando Torres. In ensuing telephone conversations Oman repeatedly, but unsuccessfully, attempted to prevail upon

---

[3]Lopez testified that, in July 2004, as defendant left the scene of a turf-related altercation on West 204th Street, defendant fired a gun in his direction.

defendant, both through intermediaries and directly, to remain in Georgia for 60 days.  Finally, in May, 2005, after defendant was shot in New York City under circumstances upon which the present record sheds little light, Oman advised him during a recorded conversation that he, Oman, was about to receive "ten" and that Oman's brother Eliese would give defendant "five," so that defendant could "calmly leave" and go to Georgia.  Oman promised to send the remaining "five" later via defendant's girlfriend.

Also testifying for the prosecution was New York City Police Detective Rolando Rivera.  Although Rivera, by the time of the trial and underlying investigation was assigned to the police Intelligence Division, in the late 1990s he had been deployed to the Manhattan North Narcotics "module" and, in that capacity, participated in the 1999 "take down" of the Gutierrez gang.  He was familiar with many of the gang's members -- including their speaking voices and lingo -- from having monitored a wire used by the gang during the investigation leading to the "take down."  He initially reviewed selected tape recordings of Oman Gutierrez's prison phone calls made between December 2004 and May 2005 in response to a tip that the Gutierrezes had been involved in the January 2005 slaying of Contreras, and was eventually requested by the prosecution to translate, transcribe and analyze the recorded conversations.  In the course of so doing, he met with Ms. Duran and Ms. Grullon.

At trial, Rivera was qualified by the court as an expert in

decoding phone conversations.  Some of his testimony bore upon the meanings of what were evidently consistently employed code words (e.g., "onion" for marijuana package, "toy" and "malacachin" for gun, and "sneakers" for thousands of dollars), but the bulk of it, covering a considerable portion of the trial transcript, consisted of interpreting portions of the phone conversation transcripts which, although sometimes veiled in their reference and import, were not encoded.  Rivera's transcript explications did not, in the main, draw upon any body of non-case specific expertise, but rather the information that he had acquired from various sources, most notably Ms. Duran, as a member of the team investigating and prosecuting the Contreras murder.  His interpretations essentially harmonized the recorded conversations with the prosecution's overall theory of how the murder plot was carried out, and almost without exception concurred with Ms. Duran's account of what had been communicated between the co-conspirators.

Defendant's presently advanced appellate claim is that Detective Rivera should not have been permitted to testify as an expert respecting the uncoded portions of the conversations captured on the Guttierez tapes -- that his doing so invaded the factfinding province of the jury and impermissibly bolstered the testimony of Duran and other prosecution witnesses whose credibility might otherwise have been cast in doubt, since many of them were at the time of defendant's trial themselves facing

prosecution or had lengthy criminal histories, or some combination of the two. Moreover, several -- including Duran -- had been offered substantial consideration in exchange for their cooperation. Defendant claims relatedly that Detective Rivera was essentially a summation witness, put on the stand to tie together all the strands of the prosecution's case for the jury much as a prosecutor would in summing up, but performing that task as a purveyor of case-specific expertise rather than as an advocate.

In affirming (109 AD3d 765 [2013]), the Appellate Division held Detective Rivera's expert testimony to have been properly received (id. at 766), but expressed the view that even if parts of his testimony had been admitted in error, any error was harmless (id., citing People v Crimmins, 36 NY2d 230 [1975]). A Judge of this Court granted leave (22 NY3d 1199 [2014]) and we now affirm. Although considerable portions of Detective Rivera's testimony were admitted in error, the proof of defendant's commission of the charged crimes was overwhelming and we perceive no significant probability that, but for the error, the verdict, as it bore upon defendant, would have been less adverse (see Crimmins, 36 NY2d at 242).

It is, of course, the role of the jury to determine the facts of the case tried before it. The jury may be aided, but not displaced, in the discharge of its fact-finding function by expert testimony where there is reason to suppose that such

testimony will elucidate some material aspect of the case that would otherwise resist comprehension by jurors of ordinary training and intelligence (see People v Cronin, 60 NY2d 430, 432 [1983]).  The decision to allow the testimony of an expert is generally discretionary, and reviewable in this Court only where discretion has not been exercised (id. at 433) or has been abused (see id.).  That said, there are situations -- and this is one -- in which an expert so palpably overtakes the jury's function to decide matters within its unaided competence, that abuse may be found.

There is, to be sure, no categorical prohibition on the introduction of police expertise into the evidentiary calculus of a criminal trial.  We have, for example, permitted expert testimony by a police sergeant respecting the way in which street-level drug sales are transacted to help a jury understand why the failure to recover drugs or marked buy-money from an individual apprehended in a buy-and-bust operation is not necessarily indicative of the accused's misidentification (People v Brown, 97 NY2d 500 [2002]).  It is instructive to note, however, that the testimony of the sergeant in Brown was carefully limited by the trial court to a discrete issue beyond the ken of ordinary jurors, and that the sergeant was not himself involved in the underlying investigation and gave no testimony as to what had actually occurred during the buy-and-bust there involved.  The situation is very different where a police

officer, qualified as an expert, has participated in the investigation of the matter being tried and, with the mantel of an expert steeped in the particulars of the case, gives seemingly authoritative testimony directly instructive of what facts the jury should find. Our cases have not dealt with this problematic scenario, but those of the Second Circuit, most notably United States v Mejia (545 F3d 179 [2d Cir 2008]) and United States v Dukagjini (326 F3d 45 [2d Cir 2002]), have.

In both of those cases, law enforcement officers involved in the investigations upon which the defendants' prosecutions were founded were duly qualified as experts but permitted to testify as apparent experts beyond their expertise and upon matters well within the grasp of lay jurors. In exploring the full reach of the permission they had been afforded, they became summation witnesses, instructing the jury comprehensively and with an aura of expertise, as to how the particular factual issues presented in each case should be resolved. This, said the Mejia court, amounted to a "usurpation of the jury's role" (545 F3d at 191), and was objectionable as well, in both Mejia and Dukagjini, for operating to inject hearsay into the evidentiary mix and to abridge the defendants' constitutional right to confront the witnesses against them; both case agent witnesses, as putative experts, had premised their testimony largely on inadmissible out-of-court statements, even when that testimony ceased to be expert and went only towards proving particular facts.

While there is here no developed denial-of-confrontation claim presented -- probably because the principal body of hearsay relied upon by Detective Rivera, composed of co-conspirator hearsay, did not contain statements that would qualify as testimonial under Crawford v Washington (541 US 36 [2004]) and because the principal out-of-court declarants with whom he consulted, Ms. Duran and Ms. Grullon, testified at trial and were subject to cross examination -- there appears little else to separate this case in its presentation of the basic evidentiary issue from Mejia and Dukagjini.  Here, as in those cases, the trial court qualified a government agent, intimately involved in the investigation of the case and development of the prosecution, to testify as an expert and the agent ended up testifying beyond any cognizable field of expertise as an apparently omniscient expositor of the facts of the case.

Had Detective Rivera been qualified to testify simply as to the meaning of coded expressions in the Gutierrez recordings and his expert testimony been accordingly limited in scope (see People v Brown, 97 NY2d at 506), the receipt of that testimony would not now be problematic for its subject matter; it is not controversial that the meaning of coded communications is a proper subject of expert testimony (see Mejia, 545 F3d at 189; Dukagjini, 326 F3d at 52).  Detective Rivera, however, was qualified by the trial court not simply to decode what was coded, but to decode telephone conversations generally and, as the trial

progressed, it became evident that the court understood that permission to extend to explaining the meaning of virtually everything that was said during Oman Gutierrez's recorded conversations, whether it was coded or not.

Mejia identified two ways in which a government agent qualified as an expert in decoding might exceed the scope of his expertise:

> "The expert might, as did the agent in Dukagjini, 'testif[y] about the meaning of conversations in general, beyond the interpretation of code words.' Id.; see also United States v Freeman, 488 F3d 1217, 1227 (9th Cir. 2007) ('The fact that [the officer expert] possessed specialized knowledge of the particular language of drug traffickers did not give him carte blanche to testify as to the meaning of other words in recorded telephone calls without regard to reliability or relevance.'). Or, we noted, the expert might 'interpret[ ] ambiguous slang terms' based on knowledge gained through involvement in the case, rather than by reference to the 'fixed meaning' of those terms 'either within the narcotics world or within this particular conspiracy.' Dukagjini, 326 F3d at 55"

(Mejia, 545 F3d at 192-193).  The present record contains, in liberal measure, both species of error.

There are, in fact, very few code words of fixed meaning used in the recorded conversations about which Detective Rivera testified.  Only a small number of expressions that would, even arguably, fit that description, are identified, and even those are not clearly referable to some fixed vocabulary in which expertise might be cultivated.  To the extent, then, that the subject conversations' meaning is not readily accessible, the

difficulty is not, in the main, that the exchanges were coded, but that they were conducted in a shifting slang whose reference was not self-evident. Detective Rivera's testimony consisted, in large part, of explaining what the conversers referred to based upon the investigative reconstruction in which he had taken part. But this kind of interpretive effort -- resolving ambiguity in utterance by situating it within a particular extra-linguistic context -- is what juries commonly do, and this jury, at least presumptively, was as competent as any other to perform that task without having its work modeled and previewed for it by a purported expert in the case. It is always possible to suppose that there are those capable, on the basis of their extra-judicial inquiries and experience, of judging the facts more incisively than the individuals actually empaneled to do so, but that does not mean that in every case it would be appropriate to have an expert guide the jury through its fact-finding paces. Trials, by design, are not decided by those pre-schooled in the matter litigated, however thorough their extra-judicial education may have been; they are, to the contrary, decided independent of case-specific preconception on the basis of the evidence introduced during the proceeding itself in accordance with the rules of admissibility. Those rules, it is true, allow the receipt of expert opinion evidence to clarify relevant issues not amenable to understanding by jurors of average intelligence and experience, but such proof is not properly received where its

purpose is simply to provide an alternative, purportedly better informed, gloss on the facts of the case.  In the latter instance, vaunted expertise merely mimics, and seeks to substitute for that which it is the function of the trial to impart and of the jury to acquire in its course.  <u>Mejia</u> put it particularly well: "when . . . officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense" (545 F3d at 191).

Nothing we have said should be understood as critical of Detective Rivera's investigative efforts; our concern is with the use to which his trial testimony was directed.  His discovery, analysis, translation (where necessary from Spanish to English), and transcription of the Gutierriez prison tapes represented extraordinarily fine police work pivotal to this case's development and preparation for trial.  With respect to defendant, however, the evidence anchoring the prosecution at trial was not primarily what was said on the tapes, much less what Rivera said about what was said on the tapes, but the eyewitness accounts of defendant's conduct immediately before and after the Contreras/Santos shootings.  That proof was utterly compelling.  Although each eyewitness's credibility might certainly have been questioned, together the witnesses's separately generated accounts meshed into a seamless narrative

evidently conclusive of the identity of the individual responsible for the shootings.  Once it was established through this testimony that defendant shot Contreras and Santos in the early hours of January 11, 2005 at the bodega on the corner of West 204th and Sherman, the general import of what was being discussed on the prison tapes would have been self-evident. Unaided, perhaps the jury would not have discerned every way in which the conversations bore upon the shootings, their motive, preparation and aftermath, but, in the large, the relation between defendant's commission of the shootings and what was said on the prison tapes was manifest and not in need of express, much less expert, clarification.  The taped conversations were, in any event, extensively explained by Ms. Duran during her appearance as a fact witness.

Defendant contends that Ms. Duran's testimony was unduly bolstered by Detective Rivera's ostensibly expert narrative substantially confirming her account.  This would be a more powerful claim for relief if Ms. Duran's testimony had been necessary to prove defendant's guilt of murder.  But, as noted, it was not.  Her testimony was important to proving that defendant murdered Contreras for a price, i.e., that he committed first degree murder, but the inference that he did so was, in light of the proof of the murder and its patent economic motive, far from obscure, and was made manifest by the taped conversations in which the contemplated payment to defendant and

its funding source were discussed in close conjunction with the persistent post-slaying problem of managing defendant's still unmet expectation that he would be compensated.  Ms. Duran's testimony, that it was understood that defendant would be paid for carrying off the assassination, was powerfully confirmed by the manifest content of the taped conversations.  Detective Rivera's imprimatur was entirely dispensable to the already overdetermined conclusion that the substantial sum earmarked for and expressly promised defendant by his incarcerated co-defendant, could have been referable only to his murder of Contreras.

In deeming the error in admitting Detective Rivera's extensive summation testimony harmless, we do not minimize the potency of this species of error to affect the outcome of a criminal trial.  Plainly, had the error occurred in a somewhat different evidentiary context or involved a preserved denial-of-confrontation claim, it could well have dictated a reversal (compare Dukagjini, 326 F3d at 62 [evidentiary error not reversible given the strength of properly admitted evidence] with Mejia, 545 F3d at 202 [evidentiary error resulting in denial of confrontation reversible as not harmless beyond a reasonable doubt]; and see United States v Grinage, 390 F3d 746, 751 [2d Cir 2004] [Dukagjini error not harmless where government agent's interpretation of phone calls was the principal evidence against the defendant and "the jury may well have afforded unusual

authority to the agent, who was presented as having expertise, as well as knowledge beyond that available to the jury" (id. at 752)]). The result of this appeal, then, should not encourage any expectation that the harmless error doctrine will reliably insulate the practice of using government agents as expert summation witnesses, and trial courts should, accordingly, be vigilant against the serious risks that such usage entails.

Accordingly, the order of the Appellate Division should be affirmed.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order affirmed. Opinion by Chief Judge Lippman. Judges Read, Pigott, Rivera, Abdus-Salaam, Stein and Fahey concur.

Decided June 10, 2015