**F I L E D**

**UNITED STATES COURT OF APPEALS**

**June 1, 2007**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAIME MENDOZA,

Defendant - Appellant.

No. 05-2054

D. New Mexico

(D.C. No. CR-04-236-WJ)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **BALDOCK**, and **McCONNELL**, Circuit Judges.

Jaime Mendoza was convicted by a jury of (1) conspiracy to possess with intent to distribute and distribution of more than five kilograms of cocaine and (2) distribution of more than 500 grams of cocaine. He was sentenced to 293 months imprisonment. Mendoza says the district court erred in admitting expert testimony, denying disclosure of the identities of two confidential informants and admitting testimony concerning threats he made to two government witnesses. We affirm.

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. Factual Background

On March 19, 2002, Nina Valdez was arrested in Albuquerque, New Mexico, after selling 294.4 grams of crack cocaine to an undercover officer. Law enforcement officers asked Valdez to cooperate and identify the source of the crack cocaine. Valdez identified the source as "Rob."[1] The officers asked her to arrange a meeting with "Rob" so they could arrest him. She called Robert Beal. During the conversation, Beal asked, "Are we in trouble?" (R. Vol. VII at 799.) Valdez said, "Yeah," which she knew Beal would understand to mean she had been arrested. (R. Vol. VIII at 988.) Upon receiving the Valdez call, Beal tried to contact Charles Britt, another dealer who sold to Valdez. Subsequently, Beal discarded the cellphone he used to contact Valdez.[2]

About four months later (July 2002), after learning she was facing ten years to life imprisonment (even after entering into a plea agreement), Valdez decided to cooperate with the government. She identified Beal as her source of supply and provided a telephone number for him. Telephone records showed the number was subscribed under one of Beal's aliases.[3] After obtaining a picture of Beal,

_____

[1] Valdez testified she did not tell the officers her source of supply was "Rob" but rather an officer suggested her source was "Richard" and she went along with it.

[2] Beal testified that when a customer is arrested, drug dealers immediately discard the telephone they use to contact the customer to prevent detection.

[3] Beal had several cellphone numbers; most were subscribed under an alias or girlfriend's name. He testified drug dealers often place their cellphone

officers began searching for him.

In late October 2002, the officers discovered Beal's address and obtained a search warrant for his residence. They executed the warrant on October 28, 2002. Because the front door was fortified and the residence had surveillance cameras, the officers used a ruse to lure Beal outside. Several officers, acting undercover, ran over his mailbox. They then knocked on his front door, asking him to come outside to assess the damage. Once he was outside, the officers identified themselves. Beal, armed with a loaded pistol, started to flee. The officers tackled and arrested him.

During the search of Beal's home, officers found an empty wrapper for a kilogram of cocaine and 1,362 grams of "fresh[ly] cook[ed]" crack cocaine on the kitchen table. (R. Vol. VI at 337.) Officers also found 89 grams of crack cocaine in the master bedroom and study, three firearms and $2,100 in cash. Beal had a safe in a bedroom, two big screen televisions, stereo equipment, a telescope, and a Power Point projector. The officers asked Beal if he would cooperate and identify his source of supply; he refused.

About two hours after the officers began searching Beal's residence, Angela Harvey, Beal's fiancee, arrived home. She began cooperating immediately. She identified Beal's source of supply as "Jaime" and provided a telephone number. She also told them where Beal would meet Mendoza to

_____

numbers under different names to avoid detection.

purchase cocaine (RG Residence). The officers subpoenaed the telephone records and learned the number was subscribed to Carla Clifton, with Mendoza as an authorized user. They also set up surveillance at the RG Residence. The telephone records showed Mendoza attempted to contact Beal six times on the night of Beal's arrest and seven times the next day. On October 30, 2002, two days after Beal's arrest, Clifton called to disconnect the phone number; it was disconnected on November 7, 2002.

In December 2002, Beal began cooperating with the government and identified Mendoza as his source of supply. Based on information Beal provided, officers began surveillance at the home of Mendoza's parents (MP Residence). Surveillance at this location was difficult, however, because the house was located in a heavy drug-trafficking neighborhood and individuals would whistle or otherwise alert the neighborhood if they saw a police officer in the area. Nevertheless, during one surveillance, Special Agent Marcus West of the Drug Enforcement Administration (DEA) observed Mendoza standing in the front yard of the MP Residence with twelve to fifteen other individuals. West saw two or three vehicles drive up on the wrong side of the curb to speak with Mendoza. Mendoza leaned in and spoke with the individuals between one and two minutes.

In February 2003, Agent West interviewed Clifton who said she had obtained a cellphone for Mendoza (later denied). After she changed her story, West served Clifton with a grand jury subpoena to testify about the use of the

telephone with that number. Thereafter, West observed Clifton's unoccupied vehicle parked in front of the MP Residence. He then saw Mendoza's vehicle pull up next to it. Clifton exited Mendoza's car, looked around and then quickly entered her vehicle. Clifton drove off with Mendoza following her. Clifton was eventually convicted of perjury concerning the telephone number.

Fitzgerald Younger was on probation for trafficking cocaine in July 2001. On May 12, 2003, officers arrested him for violating his probation. Younger cooperated immediately, naming Mendoza as Beal's source of supply.

In February 2004, officers discovered where Mendoza was residing in Albuquerque and obtained a warrant for his arrest. On February 11, 2004, Agent West and DEA Special Agent Joe Mata followed Mendoza's vehicle to a gas station. When he entered the station they arrested him and drove him back to his residence. There, Agent West told Mendoza he had been watching him. Mendoza replied, "I have been watching you. I know that you drive a silver vehicle." (R. Vol. VI at 404.) He also stated he knew West had a wife and son and had observed West at a local shopping mall. Mendoza also told West "he was stressed out and that he was tired of looking over his shoulder, glad that it was over." (*Id.* at 406.)

After Mendoza's arrest, officers executed a search warrant at his residence where they uncovered several drug ledgers in the master bedroom. They also found a May 6, 1999 purchase and sales agreement for Mendoza's vehicle, a 1997

Chevy Tahoe.  The agreement revealed Mendoza made a $4,000 cash down payment and received a $9,750 credit on a trade-in towards the purchase price of $26,950.  The monthly payments were approximately $400-$500.

Officers also seized several letters.  One letter was written to "Chili Boy" and was signed "Love, your boy J."  (*Id.* at 424.)  This letter stated in relevant part:

> But it's not the same anymore.  Don't really have anyone I can trust.
> Shit been fucked up . . . for your boy, too.  They made that girl go to
> court and tried to make her flip on me.  She handled it, I guess,
> 'cause I ain't heard shit since then.  But you know how those fags
> work.  They still might try some shit.

(*Id.*)  Another letter from "your boy J." to "Chili" stated:  "They came and got him.  Man, this is some crazy shit going on out here.  You wouldn't believe it, but I hope you put the word out.  'Cause, man, this fools [*sic*] won't leave me the fuck alone.  What I got is to handle it."  (*Id.* at 428.)  Along with these letters, officers found a letter, dated May 15, 2003, written to "Jaime" from "Donny Chavez, aka Chili" and an envelope addressed to Jaime Mendoza from Donny Chavez.  (*Id.* at 426-27.)

Officers also uncovered a witness list from Clifton's perjury trial, which included Beal and Harvey, and Clifton's presentence investigation report.  They found booking sheets from the Bernalillo County Detention Center for Beal and a Western Union receipt showing Mendoza sent money to Beal in New York in

April 2001.[4] They further seized Mendoza's cellphone, which was subscribed under a different name, and a Beretta pistol in a jacket in a bedroom closet. Mendoza told West he obtained this firearm for protection because he was "tired of looking behind him, looking over his shoulder, and that people thought he was snitching or telling on them." (*Id.* at 448.)

Officers discovered Mendoza's W-2 forms for 1999-2002 and paycheck stubs from 1998-2003. The paycheck stubs (issued mainly from various roofing companies) showed Mendoza earned about $349 per month. In Mendoza's garage was a red Mustang convertible in the process of being up-graded with new paint, rims and tires. Mendoza also had a big screen television.

After informing Mendoza of his *Miranda* rights, Mendoza agreed to speak with Agent West. He denied knowing Beal and also told West the police needed to leave Clifton alone.

## II. Procedural Background

On February 10, 2004, Mendoza was indicted for conspiracy to possess with intent to distribute and distribution of more than five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846 (Count I) and distribution of more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)

---

[4] In December 2000, Beal attempted to leave the drug trade and moved to New York for eight to nine months. Mendoza wired Beal approximately $2,600 over the period of his stay in New York.

(Count II).[5] Mendoza proceeded to trial on the theory he was not Beal's source of supply but rather a drug user who purchased drugs from Beal. He also suggested Danny Montoya (another known drug dealer) was Beal's source of supply.

At trial, the government called several witnesses seeking to establish Mendoza as Beal's source of supply.

*Robert Beal's testimony*

Beal began selling rock-size quantities of crack cocaine in 1994, when he was fourteen-years-old. At that time, his source of supply was Rondale Gaskin, also known as Mook. In May or June 1996, Beal met Mendoza through mutual friends. Mendoza offered to supply crack cocaine to Beal at a cheaper price. In late 1996/early 1997, Beal accepted Mendoza's offer and purchased nine ounces of crack cocaine. For the next four to five months, until Beal learned to cook powder cocaine into crack cocaine, Beal continued to buy crack from Mendoza.

In 1998, Beal began buying an average of one kilogram of powder cocaine per week from Mendoza and this continued until his arrest in October 2002. He paid approximately $17,000 per kilogram. Once he had the cocaine, he would convert it into crack cocaine and sell it for approximately $400 an ounce. Beal sold the crack cocaine to various individuals, including Valdez, who would then

_____

[5] Count I was based on Mendoza's cocaine sales to Beal from October/November 1996 to October 28, 2002, the date of Beal's arrest. Count II was based on the empty wrapper found on Beal's kitchen table; the wrapper had contained cocaine purchased from Mendoza.

re-sell it.

Beal and Mendoza arranged the buys over their cellphones and made their exchanges in front of either the RG or MP Residence. Beal would park his car on one side of the street and Mendoza would park on the other side. Beal would then enter Mendoza's vehicle. They would talk for a few minutes and Beal would give Mendoza money in exchange for cocaine. Beal would leave Mendoza's vehicle with the cocaine tucked in his waistband and drive away in his vehicle.

Mendoza once told Beal he earned $1,000-2,000 on every kilogram of cocaine he sold to Beal. Beal made over $3-4 million selling drugs. He used this money to promote concerts and buy real estate.[6] Mendoza advised Beal to stash his money rather than purchase real estate because these purchases would draw attention to both of them.

Beal never sold crack cocaine to Mendoza. Mendoza used ecstasy and marijuana. Beal would supply Mendoza with marijuana purchased from Valdez. On the day of Valdez's arrest, Beal did not try to contact Mendoza because Mendoza and Valdez did not know each other well and Valdez was not Mendoza's customer.

On the day before his arrest, Beal obtained a kilogram of cocaine from Mendoza. The empty wrapper found at his residence had held that cocaine. Beal

_____

[6] At the time of his arrest, Beal owned an apartment complex, a condominium and his house.

also testified the crack cocaine Valdez attempted to sell to an undercover officer on the date of her arrest was made from cocaine he purchased from Mendoza.

*Yvonne Gillam's testimony*

Yvonne Gillam began dating Beal in late 1997. She moved in with him in February/March 1998. After moving in, she learned he sold drugs. Mendoza was Beal's source of supply. She saw Beal leave several times saying he had to "pick up a package from Jaime" or "meet someone and do some business." (R. Vol. VI at 460.) When he did so, he always took money and returned home with a brick of cocaine. She accompanied Beal to meet Mendoza three times. Normally, she would stay in the car but, on one occasion she accompanied Beal to a house and went inside. She stayed in the living room while Beal and Mendoza went to a different room for twenty to thirty minutes. When Mendoza and Beal returned, Beal and Gillam left and went straight home. At home, she saw that Beal had a package of cocaine. She ended her relationship with Beal in early 1999 and has not spoken with him since.

On cross-examination, Gillam admitted she had helped Beal count his drug money. After she was subpoenaed and cooperated, government agents informed her she would not be charged for her association with Beal.

*Angela Harvey's testimony*

Harvey, Robert's fiancee, testified Mendoza was Beal's source of supply, which was consistent with her statement to officers when she arrived home on the

day of Beal's arrest (before she knew Beal had been arrested). She met Beal in January 2002, learned he sold crack cocaine in February/March 2002, and moved in with him in April 2002. She accompanied Beal several times when he met Mendoza. They would park in front of the RG Residence. When Mendoza arrived, Beal would exit his vehicle and enter Mendoza's vehicle or the two would enter the house. When Beal returned to the car, he would take a brick of cocaine from under his shirt and place it under the seat. Harvey also recalled Mendoza coming to Beal's house to collect money. A few days later, Mendoza called Beal and Beal met him. Harvey later observed Beal cooking powder cocaine into crack cocaine. She also testified that the day before Beal's arrest, he met with Mendoza.

On cross-examination, Harvey admitted that since Beal's arrest, she had daily contact with him, either in person or over the telephone. Beal discussed his decision to cooperate with the government. Once he decided to cooperate, she informed him for the first time she had already cooperated with agents on the day of his arrest. The government provided Harvey use immunity for her testimony; this immunity did not cover perjury.

*Fitzgerald Younger's testimony*

Younger had known Beal for almost fifteen years and Britt for ten to twelve years. He sold cocaine or crack cocaine "every now and then" for about a year and a half. (R. Vol. IX at 1163.) He obtained the drugs from either Beal or Britt.

-11-

However, his main role was courier, *i.e.*, Beal and Britt paid him to run errands. Beal initially obtained drugs from Rondale Gaskin. However, when Gaskin's supply became insufficient, Beal began obtaining drugs from Mendoza. Younger accompanied Beal on ten to fifteen meetings with Mendoza. They would meet Mendoza either at the RG Residence or MP Residence. Beal would place money under his shirt or in his waistband, enter Mendoza's vehicle and return with cocaine under his shirt. After Beal's arrest, Younger ran into Mendoza who asked whether he believed Beal was "going to stay strong and basically stand his ground and not say anything about this." (*Id.* at 1181.) Younger told Mendoza he did not think Beal would implicate them. Younger identified Danny Montoya as Britt's source of supply.

*Nina Valdez's testimony*

Valdez began selling crack cocaine in 1996 when she was dating Wayne Caan, also a drug dealer. She initially obtained crack cocaine from Caan, who purchased it from Rondale Gaskin. In 1995, Valdez met Beal through Caan. Three years later, she began purchasing crack cocaine from Beal for resale. She also purchased crack cocaine from Britt. When Valdez was arrested for trafficking crack cocaine, her source of supply was Beal.

Valdez first saw Mendoza in 1999. Beal asked her for a ride to the RG Residence. She agreed and parked on the street. Mendoza arrived with two other males. They all went inside the house while Valdez waited in the car. Five

minutes later, Beal came outside and entered her vehicle. She did not notice whether Beal had anything with him when he entered the house or when he returned to her vehicle. She saw Beal and Mendoza together two other times. Once, Beal called Valdez to obtain marijuana. They met at a park, where Beal entered her vehicle. She gave him the marijuana and, as Beal left the vehicle, Mendoza approached. Beal immediately went to Mendoza and began talking with him. Valdez sat in her car. On the other occasion, she saw Beal and Mendoza together at a concert. She never asked Beal about his source of supply; that was not something an individual would ask his/her drug source.

*Rita Garcia's testimony*

From 1993-2000, Rita Garcia resided with her mother and brother at the RG Residence. She knew Mendoza as her brother's friend for nine or ten years. She was also friends with Beal. In summer 2003, Mendoza told her he needed a picture of Beal for his lawyer. Although Mendoza was acting "shady" and it "seemed weird that [Mendoza] asked me for a picture of [Beal]," she gave him one. (R. Vol. VIII at 943.) Mendoza came to the RG Residence numerous times but rarely went inside the house; normally he stayed inside his vehicle and waited for her brother to come outside. She also saw Mendoza meeting people, including Beal, in front of the house. Beal would approach Mendoza in his vehicle and talk with him, but she never saw Beal enter Mendoza's vehicle.

-13-

*Mendoza's Evidence*

Beal, Younger and Valdez all agreed to cooperate with the government in the hopes of obtaining lower sentences. The jury was informed of the terms of their cooperation and plea agreements and Mendoza cross-examined them extensively about their motives for testifying. Mendoza also called two witnesses in an attempt to establish he was a drug user, not a drug dealer, as evidenced by his financial situation.

*Monique Olquin's testimony*

Olquin, the mother of Mendoza's son, dated Mendoza from 1999-2001, while he was living with Daphne Iverson. She believed Mendoza started having a drug problem in 2001. He became less affectionate, his attitude changed, he did not keep up his appearance, he slept more, lost weight, and his eyes were dilated and glassy. She helped him financially by paying, among other things, his truck payment.

*Doris Andrus' testimony*

Andrus was the real estate agent who assisted Mendoza and Iverson in purchasing their home in 2003. She was also Clifton's grandmother and was admittedly unhappy with the government for prosecuting Clifton for perjury. Mendoza and Iverson purchased the home for $112,000, putting down $6-7,000. The monthly payments were $758. She counseled Mendoza to get a better paying job and Iverson to get a job. Contrary to Olquin's testimony, Andrus felt

Mendoza was well-kept and dependable.

*The Verdict*

The jury found Mendoza guilty of both counts of the indictment. On January 24, 2005, Mendoza was sentenced to a total of 293 months imprisonment. This appeal followed.

## III. Discussion

Mendoza argues the district court erred in (1) admitting expert testimony, (2) not requiring disclosure of the identities of two confidential informants and (3) admitting testimony that he threatened two government witnesses. He asserts the errors were not harmless and rendered his trial fundamentally unfair. If the errors were individually harmless, he claims their cumulative effect requires reversal.

### A. Expert Testimony

Prior to trial, the government filed a Notice of Intention to Offer Expert Testimony. It sought to call Agent West to testify concerning (1) the methods and practices commonly used in narcotics investigations, (2) the distribution, transportation, packaging and communication methods employed by those involved in drug trafficking, (3) the organization of distribution cells, (4) the security measures used by those involved in drug trafficking, (5) the value of the controlled substances involved in the case and (6) the meaning of drug terminology. Mendoza objected, claiming West's testimony was unreliable and

would not assist the jury as required by Rule 702 of the Federal Rules of Evidence. He also claimed its prejudicial effect would substantially outweigh its probative value under Rule 403 of the Federal Rules of Evidence.[7]

The district court did not rule on the admissibility of Agent West's testimony until West was on the stand. West stated his experience and duties, but before he could answer the first case-related question, Mendoza objected to his testimony. Mendoza did not challenge West's qualifications, but claimed it was improper for West to stamp every aspect of the government's case as drug-trafficking. He also objected on relevance and reliability grounds. The court overruled the objections, gave Mendoza a standing objection and permitted West to continue his testimony.

West's initial testimony discussed (1) the types of informants and their importance in a drug investigation, (2) the types of drug dealers/sources of supply, (3) the financial difference between a crack dealer and a crack user/addict, (4) drug costs in New Mexico, (5) the methods drug dealers use to conceal their identities and avoid detection, *i.e.*, placing their cellphones, utilities and vehicles in other people's names, and (6) the characteristics of a drug deal. West then proceeded to describe his investigation of the case, beginning with

---

[7] Because his original objections (Doc. 49) were not included in the record, we glean Mendoza's objections to the government's Notice of Intention to Offer Expert Testimony from his "Reply to United States' Response to Defendant's Objections to Government's Notice to Offer Expert Testimony."

Valdez's arrest. He also testified about Beal's arrest and the search of Beal's residence. Finally, West described his efforts to locate Mendoza, Mendoza's arrest and the search of Mendoza's residence. During his description of the items found in Mendoza's residence, West offered his expert opinion that four pieces of paper found in a bedroom were drug ledgers. He also defined the word "flip," which was contained in one of the letters found in Mendoza's home.

On appeal, Mendoza abandons his objection that Agent West's testimony was irrelevant and unreliable. Instead, he argues the testimony was admitted in violation of Rule 704(b) of the Federal Rules of Evidence, which prohibits an expert from stating an opinion as to whether a defendant had the requisite mental state. He concedes West never expressly offered such an opinion, but claims the practical effect of West's testimony was exactly that – Mendoza was a drug dealer and *a fortiori* had the intent to distribute drugs. That is so, he claims, because West was permitted to offer expert opinions on matters closely associated with his fact testimony and even if West's testimony did not violate Rule 704(b), his testimony as both an expert and fact witness was extremely prejudicial and admission of his testimony violated Rule 403.

Mendoza argues the aura of expertise conferred upon West created a risk of prejudice because the jury could infer that his opinion about the criminal nature of Mendoza's actions was based on knowledge of Mendoza beyond the evidence at trial. Mendoza also claims West's dual roles as expert and fact witness

inhibited cross-examination. He claims any line of questioning he pursued with West on cross-examination was hampered by West's freedom to retreat to his training and experience, which in turn bolstered his direct examination testimony. He further claims West's testimony as both an expert and fact witness led to jury confusion because West oscillated between his dual roles.

We review a district court's admission of evidence, including expert testimony, for abuse of discretion. *United States v. Wood*, 207 F.3d 1222, 1235 (10th Cir. 2000). However, we apply plain error analysis when the defendant fails to state the specific ground for objection to the admission of the evidence and such ground is not apparent from the context in which the objection is made. FED. R. EVID. 103(a)(1), (d). Here, Mendoza did not specifically object to West's testimony under Rule 704(b) in either his written or oral objections. Mendoza admits as much but claims his objections clearly stated the concern that West's testimony would state an opinion that Mendoza had the mental state or intent to conspire to distribute drugs and to distribute drugs to Beal. Mendoza did not raise a proper objection, but we need not dwell on the standards of plain error review because the district court did not abuse its discretion in permitting the testimony.

Mendoza complains about several aspects of West's testimony to illustrate his Rule 704(b) and Rule 403 arguments. West testified about the financial difference between crack cocaine dealers and crack cocaine users/addicts, saying

crack users/addicts are categorically broke and homeless because they use their money to buy drugs whereas dealers do not spend their money on drugs but sell drugs to make money. They may also invest it in legitimate businesses. But, he continued, not all dealers have a lot of money because some are not responsible and may "blow their money" by going to strip clubs, throwing elaborate parties and putting it into their vehicles, "maybe buy new rims, new tires for their cars." (R. Vol. VI at 310-11.) Later, when discussing the items found in Mendoza's home, West presented a photograph of a vintage Mustang convertible found in the garage that "appeared to be going through an upgrade stage of paint and different rims and tires." (*Id.* at 447.) Mendoza claims this linking of expert opinion about the spending habits of drug dealers immediately followed by specific testimony about his lifestyle improperly tagged him as a dealer – he was not broke, lived modestly and had a vehicle with new rims and tires.

Mendoza's second example is to the same effect. West testified about the methods drug dealers use to communicate and the characteristics of a drug deal. West stated drug deals are "typically quick." (*Id.* at 309.) They usually begin with a telephone call between the seller and buyer to arrange a meeting place. Once they meet, the seller and buyer have a brief conversation and complete the transaction. Later West described his observations during the surveillance of the MP Residence. He stated several cars stopped in front of the residence and their drivers spoke briefly with Mendoza. West was able to ensure his testimony

concerning Mendoza's conversations with those drivers conformed to his expert opinion describing the characteristics of a drug deal.

The next example is West's expert opinion testimony that four scraps of paper found in Mendoza's bedroom containing scribbled initials and various numerical figures were drug ledgers used to record the amounts people owed for drugs. He then testified as a fact witness that these ledgers belonged to Mendoza thereby improperly suggesting to the jury that Mendoza had the intent to distribute drugs and in fact distributed them.

West also testified concerning the seizure of Mendoza's cellphone. When asked why he had obtained the subscriber information for the phone, West responded: "Again, I wanted to show that tools of the trade for a drug dealer, that they obtain cellphones and put them in other people's names to avoid detection." (*Id*. at 445.) Mendoza argues this testimony, which was cloaked in expert testimony, identified him as a drug dealer and left no room for the jury to deliberate on the matter.

Lastly, Mendoza challenges West's testimony concerning the letters found in Mendoza's home, in particular, his testimony concerning the meaning of the word "flip" found in a letter attributed to Mendoza. The following colloquy occurred:

> Q. [B]ased on your training and experience as a drug enforcement agent, what does [flip] mean? . . . .

A. "Flip" means to have someone cooperate. If I wanted to flip you, I would try to make you cooperate with me, come and help me out . . . .

Q. . . . In terms of working with . . . informants, how does . . . the term "flip," apply to them? What do you try to do? What does that mean?

A. Try to get them to cooperate with us, for law enforcement.

Q. But for what purpose?

A. For infiltrating or investigating drug organizations.

Q. And who are you going to try to investigate once you get somebody to flip?

A. The drug source of supply, the target of investigation.

(*Id.* at 425-26.) Mendoza claims that by introducing a letter in which he expressed concern that law enforcement officers would attempt to have an individual "flip" on him, followed by West's expert opinion that the definition of "flip" is to identify the source of supply, the government conveyed to the jury that Mendoza was concerned an associate would identify him as the source of supply. Thus, Mendoza asserts West was allowed to give an improper expert opinion on the ultimate issue of fact in the case – that Mendoza was a source of supply. In short, Mendoza complains that West would testify as an expert about a dealer's profile and then conveniently testify to investigative facts that placed Mendoza squarely in the profile. He claims it was a set up he was powerless to counter, prejudicing his defense and ultimately unfair.

-21-

Predictably, the government has a different take on the evidence. The government claims West's testimony did not violate Rule 704(b) because West's expert testimony helped the jury understand the drug distribution business generally and the significance of some of the evidence introduced at trial. It stresses that West's testimony did not express an opinion of ultimate fact – Mendoza had the intent to distribute cocaine. Moreover, it never asked West whether hypothetical facts mirroring the facts of the case indicated an intent to distribute. To the extent the district court erred in admitting West's testimony, the government claims the error was harmless. It asserts there was overwhelming evidence Mendoza was a drug dealer, not a drug user. Four lay witnesses, Beal, Gillam, Harvey, and Younger, all testified Mendoza supplied Beal with powder cocaine for years. Moreover, the court instructed the jury it could accept or reject West's opinions.

Rule 702 governs the admission of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Mendoza does not challenge West's expert testimony under Rule 702 and rightly so. We have consistently allowed law enforcement agents to provide expert

testimony concerning the drug trade under Rule 702. *See, e.g., United States v. Quintana*, 70 F.3d 1167, 1170-71 (10th Cir. 1995) (meaning of drug code); *United States v. Sturmoski*, 971 F.2d 452, 459 (10th Cir. 1992) (tools of the drug trade); *United States v. McDonald*, 933 F.2d 1519, 1520-23 (10th Cir. 1991) (significance of quantity of cocaine, tools of drug trade and use of food stamps to purchase crack cocaine); *United States v. Harris*, 903 F.2d 770, 775-76 (10th Cir. 1990) (drug records). Mendoza's arguments are limited to Rules 704(b) and 403.

Rule 704 provides:

(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

"Rule 704(b) only prevents experts from expressly stating the final conclusion or inference as to a defendant's actual mental state. The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state." *United States v. Richard*, 969 F.2d 849, 854-55 (10th Cir. 1992).

As Mendoza concedes, West never expressly opined that Mendoza had the requisite intent to distribute cocaine. Rather, he claims that by testifying (1)

-23-

concerning the difference between drug dealers and users, (2) the ways in which drug dealers dispose of their money, (3) the characteristics of a drug deal, (4) that the scraps of paper found in Mendoza's residence were drug ledgers, (5) that he subpoenaed Mendoza's cellphone subscriber information because cellphones are tools of the trade for drug dealers and are placed under different people's names to avoid detection, and (6) that the meaning of the word "flip" is to identify the source of supply, West improperly stated an inference or conclusion as to Mendoza's mental state, *i.e.*, that he was a drug dealer with the intent to distribute drugs. We disagree.

In *Richard*, Officer Danner, who arranged for the sale of 300 pounds of marijuana to Bernaugh, testified as an expert that the defendants assisted Bernaugh in the deal. Based on his experience, he stated a drug dealer will not invite individuals who are not aware of the nature of the transaction to participate in a drug deal. The defendants argued that by identifying the role each of them performed, Danner stated an inference that each knowingly participated in the charged offenses in violation of Rule 704(b). We rejected this argument:

> While [Danner's] remarks may have implied a belief that the [defendants] were in fact aware of the nature of the transaction, Danner did not expressly draw that conclusion or inference for the jury. Hence, the testimony was not prohibited by Rule 704(b), and the district court did not err in admitting it.

969 F.2d at 855*; see also United States v. Orr*, 68 F.3d 1247, 1252 (10th Cir. 1995) (concluding no plain error occurred in admitting expert's testimony;

"[a]lthough the jury could have inferred defendant's criminal intent from [the expert's] statements, [the expert] did *not* testify that defendant had the requisite criminal intent for fraud").

In comparison, in *Wood*, Dr. Wood was tried for first-degree murder and the lesser-included offenses of second-degree murder and involuntary manslaughter based on his treatment of patient Dykes. An expert opined that the manner of Dyke's death was homicide, which he defined as when the death is caused at the hands of another person and gave as an example facts similar to those presented in the case. He also opined that Dr. Wood's actions were reckless and fraught with the perils of causing death. Dr. Wood appealed, arguing the expert's testimony violated Rule 704(b). We agreed:

> [The expert's testimony] expressly draw[s] the conclusion or inference that Dr. Wood acted with the necessary mens rea when he caused Dyke's death. The district court instructed the jury that to convict Dr. Wood on charges of first or second-degree murder, it was required to find that he possessed the specific intent to cause harm or death to Dykes. By his testimony that Dr. Wood's actions caused Dykes's death, Dykes's death was a homicide, and a homicide involves the intentional taking of a person's life, [the expert] expressly inferred that Dr. Wood acted with specific intent to kill Dykes.
>
> Similarly, [the expert's] testimony that Dr. Wood's actions were reckless specifically describes the mens rea for involuntary manslaughter. . . . Therefore, [the expert's] testimony [did] not merely provide the facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state. If believed, his testimony necessarily dictates the final conclusion that Dr. Wood possessed the requisite mens rea for involuntary manslaughter. This intrusion into the province of the jury is

-25-

precisely the sort of testimony Rule 704(b) is designed to prevent. 207 F.3d at 1236 (quotations and citations omitted); *see also United States v. Dennison*, 937 F.2d 559, 565 (10th Cir. 1991) (holding trial court properly excluded expert testimony that a hypothetical person suffering from the same mental disorder as defendant could not form the specific intent to commit assault because the necessary inference from the testimony was that defendant did not have the capacity to form specific intent and this inference is for the jury to make).[8]

Here, Agent West's challenged testimony constitutes "facts or opinions from which the jury could conclude or infer [Mendoza] had the requisite mental state," *Richard*, 969 F.2d at 854-55; it did not expressly make that inference or conclusion for the jury as the expert did in *Wood*. Moreover, unlike in *Dennison*, the government did not provide West a hypothetical question containing facts mirroring the case facts and ask whether the facts constituted an intent to

---

[8] The D.C. Circuit has also held that a prosecutor cannot make an end run around Rule 704(b) by posing an intent question to an expert in the form of a hypothetical question containing facts mirroring the facts in the case. *See United States v. Boyd*, 55 F.3d 667, 671-72 (D.C. Cir. 1995); *but see United States v. Miller*, 395 F.3d 452, 455-56 (D.C. Cir.) (concluding no plain error occurred when prosecutor asked expert whether a hypothetical set of facts mirroring the facts of the case was consistent with the sale of drugs where expert repeatedly stated he had no personal knowledge of the case against the defendant), *cert. denied*, 545 U.S. 1101 (2005). The Seventh and Ninth Circuits have taken a more lenient view on the use of hypotheticals, allowing them if the expert does not directly comment on the *defendant's* mental state. *See United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005); *United States v. Romero*, 189 F.3d 576, 586 (7th Cir. 1999); *United States v. Brown*, 7 F.3d 648, 653 (7th Cir. 1993).

distribute.  Rather, the government initially asked West general questions concerning the drug trade and then moved into his investigation of Mendoza. While some of West's opinions mentioned facts of this case, in particular, his opinion that drug dealers often blow their money on (among other things) buying new rims and tires for their vehicles, they did not make the ultimate inference or conclusion for the jury that Mendoza had the intent to distribute drugs.  West's testimony left for the jury the duty to link his expert testimony to the facts and draw the inference or conclusion that Mendoza had the requisite *mens rea*.  His testimony did not violate Rule 704(b).

Nor did it violate Rule 403, which permits relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  In support of his Rule 403 argument, Mendoza relies on *United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003).  There, the government called a DEA agent, who was also the case agent, to testify as an expert concerning the use of code words in narcotics conversations and the meaning of various code words used in recorded conversations between the defendants and others.  During his testimony, the agent interpreted certain drug jargon but also explained other statements.  The latter testimony appeared to have been based primarily on his familiarity with the specifics of the case rather than on his general expertise in the drug trade.  The defendants challenged the testimony, claiming the agent's dual roles as expert and

case agent allowed him to serve as a summary witness, improperly testifying as an expert about the general meaning of conversations and the facts of the case.

The Second Circuit found that the use of a case agent as an expert increases the likelihood that inadmissible and prejudicial testimony will be proffered, in particular, when the expert goes beyond his expertise and summarizes his beliefs about the defendant's conduct based upon his knowledge of the case. *Id.* at 53-54. In such circumstances, the risk of prejudice is three-fold: (1) the jury may infer the agent's opinion testimony about the defendant's activity is based on knowledge of the defendant beyond the evidence at trial, (2) the defendant's ability to cross-examine the expert/fact witness may be inhibited because a failed attempt to impeach the witness as an expert may effectively bolster his credibility as a fact witness, and (3) the expert may stray from the scope of his expertise and act as a summary witness which usurps the role of the jury and creates jury confusion as to whether the witness is relying on his general experience and reliable methodology or improperly on what he has learned of the case. *Id.* at 53-55. Despite these risks, however, the Second Circuit did not categorically prohibit the use of case agents as experts. *Id.* at 56. Rather, it cautioned trial courts to vigilantly ensure a case agent's expert testimony is reliable and its probativeness is not substantially outweighed by its prejudicial effect. *Id.*

The concerns in *Dukagjini* are well taken and expressed. We agree. However, like the Second Circuit, we decline to adopt a *per se* rule prohibiting

the use of case agents as experts, but leave it to the trial judge who is attuned to the dynamics of the trial, to make the necessary 403 determination. We find no abuse of that discretion here. But even if we did the error was harmless.

Beal, Gillam, Harvey and Younger all testified that Mendoza was Beal's source of supply. While Beal, Younger and Harvey may have had self-serving motives in testifying, Gillam did not and in fact, she had not seen Beal for over four years. Additionally, although Harvey was provided use immunity from the government, her testimony was consistent with the statements she made to agents when she arrived home on the day of Beal's arrest and before she learned Beal had been arrested. Moreover, the jury was aware of the terms of Beal's and Younger's plea agreements and their motives in testifying. In addition to these witnesses, the government presented evidence showing Beal and Mendoza were in almost constant contact with each other on their cellphones and Mendoza's lifestyle was inconsistent with his legitimate income. Furthermore, the jury was informed of the statements Mendoza made to Agent West on the day of his arrest and the threats he made to Beal while incarcerated at the same facility (which were properly admitted.) *See infra* Issue C. The substantial evidence supporting the jury's verdict renders harmless any error which may have occurred in allowing West to testify as both an expert and fact witness.

B. Confidential Informants

Prior to trial, Mendoza moved for the disclosure of the identities of two

confidential informants, referred to herein as C1 and C2, claiming their testimony supported his defense that he was not Beal's source of supply. The government objected claiming the informants did not possess exculpatory information and Mendoza had failed to show a sufficient need for disclosure other than pure speculation. In the alternative to denying disclosure, the government claimed the court should hold an *in camera* hearing to determine the necessity for disclosure. *See Gaines v. Hess*, 662 F.2d 1364, 1369 (10th Cir. 1981) (stating *in camera* hearing is appropriate procedural vehicle for determining whether disclosure is required).

The district court held a hearing on Mendoza's motion. At the hearing, the government called Agent West, who had interviewed both confidential informants, and testified as follows: He met with C1 on September 3, 2002, a month before Beal's arrest. C1 was a documented DEA informant but received no remuneration for his/her services. C1 said Beal and Britt were multi-pound crack cocaine dealers in Albuquerque. C1 did not know Mendoza or have any information concerning Beal and Britt's sources of supply. However, C1 participated in a conversation with Beal and Britt in which they discussed the loss of their cocaine supply source. Beal told C1 he could not reach the source of supply and believed the source had either been arrested or stopped selling cocaine. Because he could not contact the source, Beal asked C1 to sell him a couple of kilograms of cocaine. C1 could not recall when this conversation took

-30-

place or provide a time frame. C1 also stated Beal and Britt would go back and forth between different sources of supply depending on whether the source had drugs.

West interviewed C2 on March 27, 2003, after he/she was arrested. C2 created fictitious identification documents for the individuals within Beal's drug organization and named some of these individuals during the interview. C2 also informed West that in the early stages of the organization, Beal and Britt obtained crack cocaine from Donnell and Rondale Gaskin. However, it was not too long before they found powder cocaine suppliers which would allow them to make crack cocaine. C2 did not know these suppliers or Mendoza.

After the evidentiary hearing, the court denied Mendoza's motion. As to C1, it found he/she did not know Mendoza or Beal's source of supply. Although it recognized C1 had heard Beal say he believed his source of supply had been arrested sometime prior to September 2, 2002, and Mendoza was not arrested until February 2004, the court nevertheless concluded Mendoza's claim (that C1's testimony established Mendoza was not Beal's source of supply) was speculative. It also noted Beal would be the subject of cross-examination at trial. With regard to C2, the court found he/she did not know Mendoza, was not a participant in any of the crimes charged against Mendoza and it was pure speculation he/she had any relevant information helpful to Mendoza.

Mendoza claims the court erred in denying the disclosure of C1 and C2 and

-31-

the error was not harmless. He asserts C1's testimony concerning his/her conversation with Beal and Britt would have buttressed his theory that Beal and Britt had the same source of supply. It also would have shown he was not Beal's source of supply because he and Beal were in contact from the time of the conversation until Beal's arrest.[9] As to C2's testimony, Mendoza argues it would have established Mendoza was not a part of Beal's drug organization because C2 did not know Mendoza despite his/her extensive knowledge of the organization. Thus, Mendoza claims both informants' testimony would have established reasonable doubt he was Beal's source of supply.

The government claims the court did not abuse its discretion in denying the disclosure of C1 and C2's identities. It points out that neither C1 nor C2 knew Mendoza, knew who supplied Beal with cocaine, or participated in or witnessed the crimes to which Mendoza was charged. Therefore, neither informant could testify that Mendoza was not Beal's source of supply. It further claims Beal's

---

[9] In an attempt to show Beal was not referring to Mendoza in his conversation with C1 because Beal and Mendoza were in constant phone contact, defense counsel cross-examined West concerning Beal and Mendoza's phone contacts. West testified he obtained Beal and Mendoza's cellphone records and determined the number of times they contacted each other. Although defense counsel suggested there were 1,500 contacts from 2000 to early November 2002, West could not recall the number of contacts or the time period and defense counsel did not provide any documentary evidence supporting this number or time period. West also could not recall whether there were any months in which there was no contact between Beal and Mendoza but stated there were periods of days in which there were no contacts. With the aid of Mendoza's telephone records, West was able to testify that Mendoza had contact with Beal on September 2 and 5, 2002, and several times on September 6, 2002.

comment to C1 that he could not reach his source of supply during a time when he may have been in regular contact with Mendoza had little exculpatory value and its usefulness to the defense was speculative.[10]

The government has the privilege to withhold from disclosure the identities of persons who provide law enforcement officers with information concerning violations of the law. *Rovario v. United States*, 353 U.S. 53, 59 (1957). The privilege's purpose is to further and protect the public interest in effective law enforcement. *Id.* It recognizes citizens' obligation to inform law enforcement officials when they know a crime has been committed and encourages them to perform that obligation by preserving their anonymity. *Id.* However, the privilege is not unlimited. *Id.* at 60. Where the disclosure of an informer's identity is relevant and helpful to an accused's defense or essential to a fair determination of a cause, the privilege gives way and disclosure is required. *Id.* at 60-61.

There is no fixed rule as to when disclosure of an informer's identity is

---

[10] Alternatively, the government argues that if we have any doubt as to C1 or C2's potential testimony, we should remand to the district court for an *in camera* proceeding pursuant to *Gaines*. Because the record adequately discloses C1 and C2's potential testimony, we find a remand unnecessary. *See United States v. Moralez*, 908 F.2d 565, 568-69 (10th Cir. 1990) (remanding for *in camera* hearing where record was insufficient to determine the informer's degree of involvement and whether disclosure was essential to a fair determination of the case); *Gaines*, 662 F.2d at 1368-69 (remanding for *in camera* hearing to determine whether informant could provide potentially significant exculpatory testimony).

required. *Id.* at 62. Rather, the court must balance the public's interest in protecting the flow of information against a defendant's right to prepare a defense, considering the particular circumstances of each case, including "the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* "[M]ere speculation about the usefulness of an informer's testimony is not sufficient." *United States v. Scafe*, 822 F.2d 928, 933 (10th Cir. 1987). Disclosure is not required where the information sought from the informer would be merely cumulative or where the informant is not a participant in or a witness to the crime charged. *Moralez*, 908 F.2d at 567.

A defendant seeking disclosure of a confidential informer's identity bears the burden of showing a need for such disclosure. *United States v. Martinez*, 979 F.2d 1424, 1426 (10th Cir. 1992). We review the district court's decision denying disclosure for an abuse of discretion. *Id.* at 1425-26. We find no such abuse here.

C1 did not know Mendoza or who served as Beal and Britt's source of supply. He/she also did not participate in or witness the crimes charged. We recognize C1 was present during a conversation in which Beal stated he could not reach the source of supply and believed the source had either been arrested or ceased selling drugs. However, C1 could not recall when this conversation took place or even provide a time frame. While defense counsel suggested to Agent

West there was never a month that went by between 2000 and November 2002 where Mendoza and Beal were not in contact, he did not substantiate this information with documentary evidence.[11] The only period of time in which Mendoza was able to show that he and Beal were in contact was September 2-6, 2002. However, it is pure speculation on Mendoza's part that the conversation between Beal, Britt and C1 took place around September 3, 2002, the date C1 was interviewed. Indeed, it is unlikely the conversation took place during that period because if it had, it seems C1 would have been able to recall when the conversation took place or at least provided a time frame. Further, Beal merely told C1 he believed his source *may* have been arrested or stopped selling cocaine. Again, it is mere speculation that Beal was not referring to Mendoza because Mendoza was not arrested until February 2004.

With regards to C2, *United States v. Halbert* is instructive. 668 F.2d 489

---

[11] At trial, the government called Elizabeth Eller, an intelligence research specialist for the DEA, who performed an analysis of Mendoza and Beal's telephone records. She compared the number of calls between Mendoza's telephone number and four different cellphone numbers used by Beal between September 8, 2001 (the date Mendoza's number was activated), and November 7, 2002 (the date Mendoza's number was canceled). Based on her testimony, there was a total of 377 calls between Mendoza and Beal from September 8, 2001, to March 28, 2002, and August 2, 2002, to October 29, 2002. Therefore, contrary to defense counsel's assertion at the disclosure hearing, the telephone records did not cover a two year period and the number of contacts was not 1,500. Moreover, unless Beal or Mendoza had another telephone number, there was a period of time (March 29, 2002 - August 1, 2002) where there was no contact between Mendoza and Beal, which contradicts defense counsel's suggestion that there was never a month where Beal and Mendoza were not in contact.

(10th Cir. 1982). There, Halbert and Green were accused of helping Cox rob a bank. Prior to trial, Halbert moved for disclosure of the identity of a confidential informant who had called law enforcement officials stating he had heard on the streets that Cox was involved in the robbery. This information led to the investigation of Cox and Green. Green implicated Halbert. The district court denied Halbert's motion for disclosure. Halbert proceeded to trial, where he presented an alibi defense, alleging he was at a sales meeting at the time of the robbery and his supervisor could verify his alibi. Although his supervisor testified Halbert was not at the meeting, the supervisor and another witness testified they called Halbert's apartment on the day and time of the robbery and spoke with him. The jury convicted Halbert. On appeal, Halbert argued the district court erred in denying his request for the confidential informant's identity. He claimed disclosure was required because the fact the informant did not mention Halbert was exculpatory. We affirmed, finding disclosure was not required because the confidential informant was not a participant in or witness to the robbery and Halbert could only speculate as to the informant's testimony. *Id.* at 496. We further found the fact the informant had apparently not heard Halbert was involved in the robbery had little or no exculpatory value because the informant was not an eyewitness and only learned of Cox's involvement through gossip. *Id.* Moreover, Halbert was able to present his alibi defense through other witnesses who claimed to have first-hand knowledge of the relevant events. *Id.*

-36-

Similarly, the mere fact C2 had knowledge of Beal's organization but did not name Mendoza is not exculpatory. Moreover, C2 did not know Mendoza, did not participate in or witness the crimes charged and did not know who supplied Beal with cocaine after Beal stopped purchasing crack cocaine from the Gaskins. Therefore, he/she would not have been helpful to Mendoza's defense.

The district court did not abuse its discretion in denying the disclosure of C1 and C2.

C. Threat Evidence

On the afternoon of the second day of trial, the government learned Mendoza had threatened Beal and had made a threatening gesture towards him while both were being detained at the Bernalillo County Detention Center for Mendoza's trial. The government sought to question Beal concerning the incident and add Marshall Dean, an inmate transport officer who observed the threatening gesture, as a witness. It claimed such evidence was admissible to show Mendoza's consciousness of guilt. Mendoza objected, arguing the evidence was not probative of guilt because an innocent person would also be upset at a witness who falsely accused him of a crime and therefore its probative value was substantially outweighed by its prejudicial effect under Rule 403 of the Federal Rules of Evidence.[12] Conducting the Rule 403 balancing test, the district court

<hr>

[12] when Beal needed to be moved from the Sandoval County Jail, the government specifically requested he not be moved to Torrance County, where it believed Mendoza was being detained. While Mendoza was in fact being detained in Torrance County, his

found the threat evidence was more probative than prejudicial and overruled Mendoza's objection.[13]

Beal testified Mendoza called him a "snitch" and a "bitch" and asked him why he was doing this. (R. Vol. VII at 811.) He told Beal not to go through with it and he would take care of him financially. Mendoza also made a gesture with his hands which indicated he was going "to get [Beal], kill [Beal]." (*Id.* at 812.) Dean testified he observed this gesture while he was taking Mendoza out of his cell to transport him to court for trial. The gesture involved Mendoza placing his finger on his lips and then taking his thumb and running it across his neck. Based on his training and experience, Dean interpreted the gesture to mean "stay quiet or die." (R. Vol. IX at 1222.)

Beal was not the only witness who was threatened by Mendoza. During her testimony, over Mendoza's objection, Valdez recounted a run-in with Mendoza in prison in April/May 2004. Valdez was sitting inside a prison classroom; Mendoza

_____

counsel had requested he be moved to Bernallilo County Detention Center, which is closer Mendoza also questioned why he and Beal were detained at the same facility and suggested the government created the situation to see how he would act in violation of his *Miranda* rights. However, there was no evidence supporting this theory. Indeed, to Albuquerque, so he could meet with him during trial. Therefore, it was Mendoza's counsel's actions which resulted in Mendoza and Beal being housed in the same facility. The district court also correctly concluded *Miranda* did not apply because Mendoza's threats and gesture to Beal were voluntary and not made during the course of custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[13] The court did allow Mendoza the opportunity to interview Dean outside the presence of the jury prior to Dean testifying.

-38-

was in the prison yard for recreation. Valdez looked out the window and saw Mendoza. He looked at her and looked upset. He pointed at her and mouthed something she could not understand. She interpreted these actions as Mendoza threatening her.

Mendoza claims the court committed reversible error in allowing Beal, Dean and Valdez to testify as to their interpretations of Mendoza's mouthed words and gestures. He claims the mouthed words and gestures were too vague to be admissible as probative evidence of guilt because they were just as probative of innocence. He claims an innocent person wrongly accused would be just as, if not more, likely to become angry upon seeing his accuser than a person who knows himself to be guilty. Moreover, given that the evidence did not involve words expressing a clear threat to intimidate a witness, Mendoza claims there is no negative inference to be drawn from it. Mendoza further claims the error in admitting this evidence affected the trial's outcome. He claims the evidence of guilt was not overwhelming given the witnesses' motives in testifying which undermined their credibility.

The government argues the court did not abuse its discretion in admitting the threat evidence. It claims the evidence was highly probative of Mendoza's consciousness of guilt and therefore relevant. Contrary to Mendoza's claim that his threats tended only to prove he was angry because he was being falsely accused, the government asserts the weight of authority is that a defendant's

threats against a cooperating witness tend to prove the defendant is conscious of his guilt. It also points out that the meaning of Mendoza's mouthed words and gestures was not ambiguous to Beal, Dean or Valdez and each was allowed to testify about his or her perceptions. Moreover, both Beal and Dean demonstrated to the jury the gesture Mendoza made to Beal so the jury could ascertain the accuracy of their interpretations of the gesture. Further, the government claims Mendoza's gesture to Beal was not ambiguous as it was an obvious threat to kill Beal if he testified.

We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Knox*, 124 F.3d 1360, 1363 (10th Cir. 1997). Because evidence that a defendant has threatened a cooperating witness constitutes evidence of "other crimes, wrongs, or acts," we evaluate the admissibility of such evidence under Rule 404(b) of the Federal Rules of Evidence. *See United States v. Esparsen*, 930 F.2d 1461, 1475-76 & nn.15-16 (10th Cir. 1991) (stating Rule 404(b) applies to conduct occurring before and after the charged conduct).[14]

Rule 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

---

[14] Both the district court and the parties erroneously believed Rule 404(b) did not apply to the threat evidence.

"The list of proper purposes is illustrative, not exhaustive, and Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) (quotations omitted). "To determine if the admission of Rule 404(b) evidence was proper, we apply a four-part test which requires that: (1) the evidence was offered for a proper purpose under Fed. R. Evid. 404(b); (2) the evidence was relevant under Fed. R. Evid. 401; (3) the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice under Fed. R. Evid. 403; and (4) the district court, upon request, instructed the jury to consider the evidence only for the purpose for which it was admitted." *United States v. Wilson*, 107 F.3d 774, 782 (10th Cir. 1997) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). Evidence is relevant under Rule 401 if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.

The four requirements for admissibility of Rule 404(b) evidence are met in this case. First, Mendoza's threats to Beal and Valdez were not admitted to prove his criminal disposition. Rather, they were offered to prove his consciousness of guilt, which is encapsulated in Rule 404(b)'s motive, intent and knowledge language. *See Esparsen*, 930 F.2d at 1476 n.16.

Second, the evidence was relevant under Rule 401. "Evidence of threats to a prosecution witness is admissible as showing consciousness of guilt if a direct connection is established between the defendant and the threat . . . ." *United States v. Smith*, 629 F.2d 650, 651 (10th Cir. 1980). Here, Mendoza himself made the threats to the cooperating witnesses. Contrary to Mendoza's arguments, the threats were not ambiguous. Beal testified Mendoza called him a "snitch" and "bitch" and asked him why he was doing this. Whether Beal heard these words, read Mendoza's lips or a combination of both occurred is unclear. However, the jury was aware of this and heard testimony concerning the conditions under which Beal and Mendoza conversed. Moreover, the more damning evidence, Mendoza's gesture to Beal, was witnessed by both Beal and Dean. Their opinions as to this gesture's meaning were admissible under Rule 701 of the Federal Rules of Evidence.[15] *See United States v. Garcia*, 994 F.2d 1499, 1506-07 (10th Cir. 1993) (explaining the requirements for lay witness testimony in the form of opinions and inferences under Rule 701). And, because the gesture was demonstrated for the jury, the jury was allowed to reject or accept their interpretations. With regard to Valdez's testimony, she described for

_____

[15] Rule 701 provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

the jury what she observed (that Mendoza was upset, mouthing something to her and pointing at her) and had first-hand knowledge of the events to which she testified. Therefore, her opinion that Mendoza was threatening her was admissible under Rule 701. Again, the jury was allowed to accept or reject her opinion.

Third, the district court expressly weighed the probative value of the threat evidence against the potential for unfair prejudice under Rule 403 and concluded the former substantially outweighed the latter. District courts are afforded broad discretion in Rule 403 balancing decisions. *United States v. Cherry*, 433 F.3d 698, 702 (10th Cir. 2005), *cert. denied*, 126 S.Ct. 1930 (2006). We see no reason to disturb the court's Rule 403 decision.

Lastly, Mendoza did not request a limiting instruction. In fact, in the proposed jury instructions, the court included a Rule 404(b) instruction but both parties agreed it was not applicable to the threat evidence. While the parties were mistaken, *see supra* n.14, the fact remains Mendoza never asked the court to instruct the jury on the proper use of the threat evidence.

We find no error in the district court's admission of the threat evidence.

D. Cumulative Error

To the extent we find individual errors harmless, Mendoza claims the cumulative effect of those errors substantially affected his trial's outcome. The cumulative error analysis' purpose is to address the possibility that "[t]he cumulative effect of two or more individually harmless errors has the potential to

prejudice a defendant to the same extent as a single reversible error." *United States*

*v. Rosario Fuentez*, 231 F.3d 700, 709 (10th Cir. 2000).

> A cumulative-error analysis merely aggregates all the errors that
> individually have been found to be harmless, and therefore not
> reversible, and it analyzes whether their cumulative effect on the
> outcome of the trial is such that collectively they can no longer be
> determined to be harmless. Unless an aggregate harmlessness
> determination can be made, collective error will mandate reversal, just
> as surely as will individual error that cannot be considered harmless.
> The harmlessness of cumulative error is determined by conducting the
> same inquiry as for individual error--courts look to see whether the
> defendant's substantial rights were affected.

*United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990). However,

"[c]umulative-error analysis should evaluate only the effect of matters determined to

be error, not the cumulative effect of non-errors." *Id*. at 1471.

The only potential error (which is assumed only) in this case was the

admission of West as both an expert and fact witness. There is no cumulate effect.

AFFIRMED.

ENTERED FOR THE COURT

Terrence L. O'Brien
Circuit Judge

-44-